# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 10, 2017          Decided August 11, 2017

No. 16-7056

MICHELE HALL,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00324)

———

*Gregory L. Lattimer* argued the cause and filed the briefs for appellant.

*Lucy E. Pittman*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: ROGERS, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: This case arises from restaurant patron Michelle Hall's claims that employees of Cities Restaurant and Lounge, and the Metropolitan Police Department officers they summoned, reacted overly harshly when she raised a question about her bill and temporarily left the restaurant. Hall appeals the district court's final judgment against her resulting from dismissal of some of her damages claims on the pleadings, and others on summary judgment.

Hall celebrated her birthday with friends at Cities. Near the end of the evening, Hall was surprised by some of the charges on her bill due to what turned out to be miscommunication with the promoter who had set up the party for her. Before the billing question was fully resolved or Hall's party disbanded, some additional people on Hall's guest list arrived late and texted her; rather than pay a cover charge to join her at Cities, the late arrivals said they would go to a no-cover-charge bar across the street and asked Hall to join them for a quick drink. Hall then stepped out of Cities temporarily to greet those friends at the bar opposite. When she did so, Cities still held Hall's credit card and driver's license, and several of Hall's celebrants stayed at the table at Cities with the bill, Hall's purse, her phone, and her birthday gifts.

Cities employees responded as if Hall's departure were an attempt to avoid paying her bill. They called the police to report felony theft of services. The responding officers located Hall at the bar across the street and broke down the door of the single-occupancy bathroom where Hall and a friend were freshening their makeup and using the toilet. Without asking her any questions about what happened at Cities, Hall contends, the police handcuffed Hall, dragged her out of the bar, and detained her on the sidewalk and then in a squad car for about forty-five minutes. While she was sitting handcuffed in the police cruiser, Hall asked a passing officer who had not

been involved in her initial arrest why she was being held. The officer replied that Hall had walked out on her bill. Hall objected that she had not; indeed, Cities still had her credit card and driver's license. The officer, hearing that information for the first time, went into the restaurant and came back with a receipt charging the full amount of Hall's bill to her credit card. Hall promptly signed the receipt and the officer released her.

Hall brought this suit for damages against the District of Columbia, its officers, Cities, and its manager. The district court dismissed some of Hall's claims on the pleadings and, after discovery, granted summary judgment in defendants' favor on the rest. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## Background

Because Hall's claims were dismissed either on the pleadings or at summary judgment, the factual background draws inferences in Hall's favor from her complaint and from facts revealed through discovery. *See Mpoy v. Rhee*, 758 F.3d 285, 287 (D.C. Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam). Needless to say, where there are evidentiary conflicts, jurors might well find the facts differently. Our recitation of events, as definitive as it may sound, is thus necessarily provisional due to the procedural posture of the district court's ruling.

In 2012, Michelle Hall, who lived and worked in Washington, D.C., arranged through event promoter Ryan White to have her twenty-ninth birthday party at Cities Restaurant and Lounge, located at 919 19th Street Northwest. White had coordinated Hall's birthday party at Cities the previous year, and Hall understood that she would again be

served two free bottles of alcohol as incentive to bring her business to Cities. When Hall arrived at Cities for the party on March 17, Cities requested that Hall leave her credit card and identification with restaurant employees, which she did.

Several hours later, after the group consumed three bottles of alcohol and some food, a server presented Hall with a bill for $1,104.74. It reflected a charge of $935.04 for the food and all three of the bottles of alcohol the group had consumed, plus a $169.70 tip. Because Hall had not expected to pay for the first two bottles of alcohol, she texted her objection to Ryan White, the party promoter, who responded that she was mistaken; Cities had not agreed to provide any free bottles of alcohol this time. Hall felt misled, and when White stopped responding to Hall's text messages, she spoke with manager Seyhan Duru, who alerted the restaurant owner to the dispute. Meanwhile, Hall's party guests, who had agreed to contribute money for the food and third bottle consumed, started putting cash in a bill book towards paying the check.

While Hall's friends remained at Cities and attempted to work something out with Duru and Cities' owner, Hall went to a bar across the street to meet friends who had arrived at the tail end of the party at Cities and did not wish to pay Cities' forty-dollar cover charge to enter just as the group was finishing up there. Because Cities had stamped Hall's hand for re-entry and the restaurant retained the credit card and driver's license she had handed over when she arrived, and because Hall left her birthday presents, her purse, her cell phone, and most of her friends at Cities, and had told the server to leave the bill on the table as they were "still working on it," J.A. 100, she did not anticipate that the restaurant would have any concerns about her temporarily leaving the premises.

Shortly thereafter, however, a Cities employee called the police to report that an "intoxicated female" wearing a yellow sundress had refused to pay her bill. J.A. 165. The police apparently registered the call as a report of "theft one of services," or felony theft in the first degree, meaning the value of what was stolen exceeded $1000. Lee Dep., 25:16-18, Mar. 9, 2015; D.C. CODE § 22-3212(a). The call was puzzling given the record evidence showing that Cities had swiped and received approval for a $935.04 charge to Hall's credit card eleven minutes before the police report recorded the call from Cities.

Police arrived and entered the bar opposite Cities. According to Hall's account, they found Hall in the bathroom, announced themselves as the police and ordered Hall to open up, almost immediately broke down the door, "slammed" her against a wall, *See* Hall Dep., 49:1, Feb. 12, 2015, handcuffed her, and dragged her out of the bar, all without asking her any questions to verify Cities' complaint. The police detained Hall, restraining her in what Hall alleged and some of the evidence confirmed to be varying positions of discomfort, for approximately forty-five minutes.

Hall complained that her handcuffs were too tight. The arresting officer, Alice Lee, responded by tightening the cuffs. Lee forced Hall to her knees on the sidewalk, where Hall's underwear was exposed to passers-by and her knees scraped and bruised by the concrete. Lee repeatedly tightened Hall's handcuffs, and even yanked Hall's handcuffed arms behind her. When Hall asked Lee "What's going on?" Lee responded "[Theft of] services." Hall Dep. 49:18-50:4. Officer Lee did not identify herself to Hall. Only after Lee had brought Hall into the street could Hall read Lee's badge number. Officer Lee placed the handcuffed Hall in the back of a police cruiser.

As noted above, what could be viewed as Cities' and the police's over-reaction to Hall's dissatisfaction about a liquor charge she had not anticipated was quickly resolved as soon as an officer listened to Hall's version of events. While Hall was sitting handcuffed in the police vehicle with the window down, she asked another police officer why she was detained. When the officer responded that Hall had walked out on her bill, Hall objected that she most certainly had not; in fact, she had even left her credit card with Cities' staff. The officer went into Cities, came out with a credit card receipt charging Hall for the full bill and, when she promptly signed it, he released her.

Hall suffered emotional trauma, cuts and bruises, and an injured wrist. She sued the District, Officer Lee and Lee's partner (an unknown John Doe officer), Cities, and its manager Seyhan Duru. The complaint alleged excessive force and assault and battery by Officers Lee and Doe, intentional and negligent infliction of emotional distress by the officers and Duru, negligence on the part of all defendants, conversion by Cities, defamation by Cities and Duru, and false arrest and false imprisonment in violation of state law and the United States Constitution against the officers. Officer Doe does not seem to have been identified and is not listed as a party on appeal. *See* Appellant Br. Certificate as to Parties, Ruling, and Related Cases.

The district court granted a motion to dismiss all claims against the District and the officers except the common law battery claim. *Hall v. District of Columbia*, 73 F. Supp. 3d 116 (D.D.C. 2014). Cities and its manager Seyhan Duru did not file or join any motion to dismiss. The parties then conducted discovery, deposing Hall, Officer Lee, Duru, two of Hall's friends—Kay Vollans and Gary Jones—who were at Cities with her that night, and a radiologist who examined Hall's injured wrist after the incident  Officer Lee, Cities, and Duru

then moved for summary judgment on all remaining counts. The court granted judgment to Officer Lee on the battery claim, concluding that no reasonable jury could conclude that her use of force was unjustified, and granted summary judgment to Cities and Duru on the common law tort claims against them. *See Hall v. District of Columbia*, No. 13-cv-324, 2016 WL 1452325 (D.D.C. Apr. 12, 2016). Hall appealed.

We affirm the dismissal of the intentional and negligent infliction of emotional distress claims and the negligence claims against Officer Lee and the District of Columbia. We also affirm the grant of summary judgment to Duru on all claims against him. We vacate the judgment on all remaining claims and remand for further proceedings. The allegations of the complaint suffice to make out claims under section 1983 of false arrest and excessive force, as well as common law assault, false arrest, and false imprisonment against Officer Lee. The evidence suffices to create material factual disputes on the common law battery claim against Officer Lee, and the defamation, negligence, and conversion claims against Cities.

## Analysis

We group the claims into three clusters for analysis, each of which turns on one of three common issues. First, relevant to the common law claims against Cities, did Cities employees act reasonably and in good faith in calling the police to report Hall's alleged theft of services? Second, was the police arrest and detention of Hall reasonable under the Fourth Amendment? And, third, did police use excessive force against Hall, or was their force justified by resistance on Hall's part? We apply settled District of Columbia law. Our analysis is not intended to express any view on the ultimate resolution of Hall's claims, nor is it intended to modify D.C. law.

## I.      Common Law Claims against Cities and Duru Resolved on Summary Judgment

The viability of the first group of claims turns on whether a reasonable jury would be required on the summary judgment record to find that Cities, through its employees, acted reasonably toward Hall, called the police in good faith, and charged her only for what she owed, or whether Hall has triable common law tort claims because the evidence could support contrary determinations. The district court granted summary judgment to Cities and its manager Seyhan Duru on all counts against them. We review the grant of summary judgment *de novo*, examining "the facts in the record and all reasonable inferences derived therefrom in a light most favorable to" Hall. *Robinson v. Pezzat*, 818 F.3d 1, 7-8 (D.C. Cir. 2016) (quoting *DeGraff v. District of Columbia*, 120 F.3d 298, 299-300 (D.C. Cir. 1997)). Because, as the district court correctly held, the record contains no triable factual disputes material to the tort claims against Cities employee Seyhan Duru, we affirm the grant of summary judgment in his favor. As to Cities, however, we conclude that material factual disputes preclude summary judgment in its favor on all claims against it.

### a.  The Record Does Not Support Claims Against Seyhan Duru

Hall's tort claims against Duru charge him with negligence, negligent and intentional infliction of emotional distress, and defamation for calling the police and falsely accusing Hall of theft. *See* Compl. ¶ 36. Discovery failed to corroborate the allegation that Duru placed the 911 call. Instead, the only record evidence directly on point identifies manager Carla Urquhart as the Cities employee who called the police to report that Hall refused to pay. *See* J.A.165; Lee Dep., 62:6-16. Duru testified that he did not communicate with the

police at all. *See* Duru Dep., 38:1-41:22, Mar. 9, 2015. The record identifies Urquhart as someone to whom the responding officers spoke in person. *See* Lee Dep., 62:6-16; *see id*. 29:22-30:16. Hall failed in discovery to ask Urquhart whether Duru or anyone else told her to call the police. In her own deposition, Hall admitted that she had not been in a position to observe and so could not testify who made the phone call. Hall did not testify to any other interaction between Duru and the police. *See* Hall Dep., 31:4-32:8.

Hall contends that Duru's responsibility for calling or directing an employee to call the police can be inferred from Duru's role as the manager with whom Hall spoke about the bill. But the record does not support that inference. Hall testified that she initially disputed the bill with Duru, and that Duru then went to get the restaurant's owner. The owner and Duru then spoke with Hall's friend, Kay Vollans, and later with another of Hall's friends named Alana Hill. Hall Dep. 20:20-21:13; 23:7-25:19. Duru was not the only Cities employee to speak with Hall or her party about the bill dispute, nor is there any evidence that he directed anyone to call the police. Accordingly, we affirm the district court's grant of summary judgment to Duru on the claims against him personally.

### b. The Record Contains Triable Issues Supporting Claims Against Cities

The district court granted summary judgment to Cities on the ground that it was undisputed that Hall failed to pay the full amount of her bill, making it reasonable for Cities to report her to the police for theft of services. *Hall*, 2016 WL 1452325, at *3. As we read it, however, the evidence could also support the contrary conclusion. There are material disputes as to how much, if anything, Hall owed when Cities reported her to the police, how much she had paid in cash in addition to the credit

card charges, and whether Cities acted in good faith in placing the 911 call.

First, record evidence raises a genuine issue of material fact as to whether Hall had left sufficient funds to cover her bill before Cities called the police. Cities charged Hall's credit card $935.04—an amount that covered the food and drink purchases on a $1,104.74 total bill but excluded a $169.70 tip. A credit card transaction record appears to show that the credit card company approved the charge at 9:24 p.m., eleven minutes before police records indicated a call from Cities.

Second, the record does not establish that the tip was mandatory. Cities' brief in the district court contended that it was, *Hall*, 2016 WL 1452325, at *3, but no witness so testified. The record does not disclose the restaurant's tipping policy nor why, if the tip was mandatory, restaurant employees sought the credit card company's approval for only $935.04 rather than $1,104.74. The restaurant receipt does not state that the tip is mandatory, but ambiguously shows $169.70 on its own tip line, before the subtotal, and invites "Add'l Tip." J.A. 164. Needless to say, if the tip was optional, Cities could not reasonably have reported Hall to the police for any failure to pay it.

Third, Hall testified that, before she went across the street, members of her party had also put cash in the Cities bill book to contribute toward the food and the third liquor bottle they had ordered. Even if the tip were mandatory, a jury could reasonably conclude the cash the guests had put in the bill book—with the intention that Hall pocket it before paying the whole bill with her card, or that it be subtracted from whatever amount was ultimately charged to Hall's credit card—sufficed to cover the $169.70 shortfall. The record thus could support a determination that Hall had left enough funds to pay her bill in

full before the arrest, and that Cities knew or should have known as much.

Fourth, there is a triable issue as to whether Hall had abandoned the bill when the restaurant contacted police. Under the law of the District of Columbia, leaving an establishment without paying for services that one has reason to believe are available only for compensation is *prima facie* evidence of theft of services. D.C. CODE § 22-3211(c). Even a finding that Hall walked out of the restaurant before the bill was paid would not, however, obligate a jury to find theft of services. The undisputed evidence of record could support a jury determination that Hall did not abandon the bill because Cities had her credit card, and that in any event she intended to return to settle up. As noted above, when Hall went to the bar across the street, she left her credit card and driver's license with Cities staff, and left birthday presents, her purse, and her cell phone at the table in Cities, along with most members of her party, who also consumed the food and drink that were charged on the bill. Given all the indicia that the bill had not been abandoned, Hall's physical departure from Cities without her credit card, driver's license, other possessions, or guests is hardly dispositive, especially given Cities' practice of stamping customers' hands for re-entry.

Fifth, the record supports an inference that Cities in fact received a windfall from Hall. Before the police released Hall from custody, she signed a credit card receipt for $1,104.74—the full amount of the bill, including tip. So, even if the tip were mandatory and the cash in the bill book were less than $169.70, the presence of some cash in the bill book that Cities picked up and retained supports an inference that Cities received more than the total on the bill: the $1,104.74 she signed for in the police cruiser, plus whatever cash was in the book.

Sixth, the summary judgment record could support a finding that Cities acted in bad faith by reporting felony theft—"theft one"—defined as theft of property worth $1,000 or more. *See* Lee Dep., 25:16-18 ("She was the only individual matching that description for an alleged crime of theft one of services."); Lee Dep., 26:6-7 ("[W]e got the call for a theft one of services from Cities . . . ."); *compare* D.C. CODE § 22-3212(a) (defining theft in the first degree as theft of property worth $1,000 or more and imposing penalty of up to ten years' imprisonment), *with id*. § 22-3212(b) (defining theft in the second degree as theft of property of any value, carrying a maximum penalty of 180 days' imprisonment). A jury could reasonably find that the credit card company had authorized Cities' charge of $935.04 before Cities called the police, which in turn could suggest that Cities misrepresented to the police the amount of money that Hall owed the restaurant: On the summary judgment record, a reasonable jury could find that Hall arguably only owed a maximum of $169.70 minus the cash in the book—potentially a net negative, as just discussed, but at most a misdemeanor amount.

The factual record, with inferences drawn in Hall's favor, defeats summary judgment on all claims against Cities. Accordingly, we vacate the order granting summary judgment to Cities and remand for further proceedings.

### i.     The Record Supports Defamation by Cities

Hall has a viable defamation claim because a reasonable jury could find on this record that Cities employees acted in bad faith by reporting Hall to the police as having committed felony theft. Defamation consists of:

(1) . . . a false and defamatory statement concerning the plaintiff; (2) that the defendant published . . . without privilege to a third party; (3) [with] fault . . . amount[ing] to at least negligence; and (4) either . . . the statement was actionable as a matter of law irrespective of special harm [*i.e.*the loss of something having economic or pecuniary value caused by someone other than the defamer,] or . . . its publication caused the plaintiff special harm.

*Williams v. District of Columbia*, 9 A.3d 484, 491 (D.C. 2010); *see Charlton v. Mond*, 987 A.2d 436, 438 n.4 (D.C. 2010) ("Publication of defamatory matter is its communication . . . to one other than the person defamed.") (quoting RESTATEMENT (SECOND) OF TORTS § 577(1) (1977)). A statement that falsely imputes a criminal offense is defamatory *per se*. *See Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C. 1979); *see also Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 934 F. Supp. 2d 204, 218 (D.D.C. 2013).

District of Columbia law provides a qualified privilege to any person who reports a crime, as long as the "statement about suspected wrongdoing is made in good faith to law enforcement authorities." *Carter v. Hahn*, 821 A.2d 890, 894 (D.C. 2003) (quoting *Columbia First Bank v. Ferguson*, 665 A.2d 650, 655 (D.C. 1995)). No privilege attaches to a statement made "without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Id*. (quoting *Columbia First Bank*, 665 A.2d at 656).

A jury could reasonably conclude that Cities acted in bad faith when it called the police. As described above, the record supports an inference that Cities reported Hall for theft of services in the first degree—a felony that is triggered by theft

of $1,000 or more. A reasonable jury could conclude that Cities' employees negligently made a false report, indifferent to or reckless of its effects on Hall, for at least two reasons. First, as discussed above, a reasonable jury could conclude that Cities charged Hall in full or, indeed, that Cities overcharged her by keeping the cash in the bill book as well as charging Hall's credit card, which a reasonable jury could also conclude, Cities had already charged for the full amount of the party's food and alcohol. Second, given that the restaurant stamped the hands of patrons upon entry in the apparent expectation that they might come and go throughout the evening, Hall had not retrieved the credit card and driver's license she turned over when the party arrived, and Hall's friends and many of her possessions were still at the table they had occupied with Hall throughout the evening, a reasonable jury also could conclude that Cities lacked any reasonable basis to believe that Hall's exit from the restaurant was anything but temporary. Accordingly, we vacate summary judgment on Count VIII alleging defamation against Cities.

### ii. The Record Supports Cities' Negligence

The same facts that support the defamation claim suffice to create a triable issue regarding negligence. To prove a negligence claim, a plaintiff must establish "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1038 (D.C. 2014). "In the District of Columbia the applicable standard for determining whether an owner or occupier of land has exercised the proper level of care to a person lawfully upon his premises is reasonable care under all of the circumstances." *Id.* (quoting *D.C. Hous. Auth. v. Pinkney*, 970 A.2d 854, 866 (D.C. 2009)). Further, "[a]s a general rule[,] the proprietor of a place of public resort is

subject to liability to his business invitees by the acts of other patrons or third persons if the proprietor by the exercise of reasonable care could have known that such acts were being done or were about to be done." *Grasso v. Blue Bell Waffle Shop, Inc.*, 164 A.2d 475, 476 (D.C. 1960). There is no dispute that Hall was lawfully at Cities and that Cities had a duty to treat her reasonably under the circumstances. *See Sandoe v. Lefta Assocs.*, 559 A.2d 732, 738 (D.C. 1988). Under the familiar *respondeat superior* doctrine, "an employer may be held liable for the acts of his employees committed within the scope of their employment." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 (D.C. 2001). Thus, if Cities' personnel lacked grounds to conclude that Hall owed and refused to pay an amount in excess of $1,000, then Cities may be liable for their negligent act of reporting Hall to the police. *See id*. at 758.

The district court granted summary judgment to Cities on the negligence claim because, in its view, Cities did not proximately cause Hall's injuries. Causation for purposes of the negligence claim entails a two-pronged inquiry: (1) whether the defendant's alleged negligence was the "cause-in-fact" of the plaintiff's injury, and (2) whether the defendant proximately caused the injury or instead, despite cause-in-fact, should be relieved of liability because the "chain of events leading to the plaintiff's injury is unforeseeable or highly extraordinary in retrospect." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002) (quoting *District of Columbia v. Carlson*, 793 A.2d 1285, 1288 (D.C. 2002)). Liability attaches to one who sets in motion harmful conduct performed by another—such as the police officers here—when "the danger of an intervening negligent or criminal act should have been reasonably anticipated and protected against." *Carlson*, 793 A.2d at 1290 (quoting *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980)).

Based on the evidence of record, a reasonable jury could find that Cities' call actually caused the arrest, and that it was foreseeable that police would arrest Hall based on Cities' report that Hall fled the establishment after having refused to pay a bill that it said exceeded $1,000. There is certainly no evidence that Duru, Urquhart, or anyone else working for Cities told the police that arrest was unnecessary, or that they did anything but invite and encourage it. Indeed, Hall testified that she saw Duru standing outside staring at Hall when she was in handcuffs in the squad car, and that he was nodding and laughing at Hall, gloating over her arrest. *See* Hall Dep., 31:7-11, 32:3-8. In sum, a jury could find both that Cities' personnel's call to the police was the cause-in-fact of Hall's arrest, and that they should have foreseen that their allegation of facts amounting to felony theft would cause an arrest and some associated harm, satisfying the proximate cause requirement.

The district court further held that Cities could not have reasonably foreseen that calling the police would result in Officer Lee's use of excessive force. *See Hall*, 2016 WL 1452325, at *3. But anticipation that the force would be unlawfully excessive is not a prerequisite to Cities' negligence liability to Hall. A reasonable jury could find it foreseeable that an unjustified arrest, even without excessive force, would cause some modicum of the physical and emotional harm the record suggests Hall experienced due to Cities' 911 call. Arrest without justification can be deeply disturbing, and arrest itself often involves some physical discomfort, unnatural restraint, and forceful handling.

For example, Hall testified that the arrest left her bruised on her arm, chin, shoulder and knees, scraped at her knees, and her wrist cut and bleeding as well as internally injured. Hall

Dep., 80:4-82:20; J.A. 61-63. She also testified that the arrest was a "very traumatic experience" causing her residual anxiety, that she repeatedly remembers the day "too much for comfort," and that the arrest has had a "significant effect" on how and how much she interacts with people. Hall Dep., 106:1-20. In view of the record evidence capable of supporting a finding that Cities' negligent or reckless conduct proximately caused the arrest, a jury that so found should be permitted to determine what portion of Hall's harm would have been reasonably foreseeable had the arrest been unjustified but the force reasonable. Indeed, Hall's emotional distress alone could support negligence liability: "[A] plaintiff may recover for negligent infliction of serious emotional distress, even without an accompanying physical injury, if the plaintiff was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety . . . regardless of whether plaintiff experienced a physical impact as a direct result of defendant's negligence." *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 423 (D.C. 1991) (alteration in original) (quoting *Williams v. Baker*, 572 A.2d 1062, 1067 (D.C.1990) (en banc)).

### iii. The Record Supports Conversion by Cities

There is no dispute that Hall has now, at the very least, paid Cities' bill in full. Indeed, as noted above, there are various ways in which the evidence could support a finding that Hall overpaid Cities. First, the record evidence does not place beyond dispute that the $169.70 tip on the final bill was mandatory. A jury could find that the tip was optional, but that Cities effectively extracted it from her with the aid of the police, amounting to conversion. Second, even if Hall owed a tip, the evidence showed she signed a credit card receipt for the full amount, including that tip, and that Hall's party also put in the bill book cash which Cities never credited or returned to

her. The evidence thus could readily support a determination that Hall overpaid, having left cash, but also ultimately paying the full amount of the bill, including tip, with her credit card.

Whether this claim is best analyzed under the conversion doctrine as Hall asserts, *see Chase Manhattan Bank v. Burden*, 489 A.2d 494, 495 (D.C. 1985) (conversion doctrine imposes liability for "any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto"), or is more aptly viewed as a claim of unjust enrichment, *see Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) (unjust enrichment occurs where "a person retains a benefit (usually money) which in justice and equity belongs to another"), there is a triable factual dispute over whether Hall unwillingly overpaid Cities. The district court treated the tip as mandatory and as unpaid, but there is no record evidence to require that inference. *See Hall*, 2016 WL 1452325, at *4. Moreover, the record could support a finding that the circumstances under which Hall signed for the full amount of the bill—in handcuffs in the back of a police cruiser—were coercive. *See* Hall Dep. 32:12-14; Appellant Br. at 22. Regardless of whether the tip was required or Hall's signature coerced, once Hall had signed for $1,104.74, the cash left in the bill book was a clear windfall to Cities. Count VII alleging conversion is thus remanded for further proceedings.

## II. Probable Cause-Related Claims Against Officer Lee Dismissed on the Pleadings

The second cluster of claims turns on whether the police arrested Hall without the requisite justification under the Fourth Amendment and the common law. Unlike the claims just discussed, which the district court disposed of at the summary judgment stage, Officer Lee filed and the court

granted a motion to dismiss these claims on the pleadings under Federal Rule of Civil Procedure 12(c). The court determined that Hall's own allegations supported probable cause, and that in any event Officer Lee was entitled to qualified immunity on the conduct alleged. It thus dismissed Hall's section 1983 false arrest and common law false arrest and imprisonment claims for failure to state legally cognizable claims. *Hall*, 73 F. Supp. 3d at 121.

We review those determinations *de novo*, asking whether, treating the plaintiff's allegations as true and reading them in the light most favorable to the plaintiff, the complaint shows that defendants necessarily acted with probable cause to arrest or, if not, whether Officer Lee would be entitled to qualified immunity from liability for her actions. *Mpoy*, 758 F.3d at 287; *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 129-30 (D.C. Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). A Rule 12(c) motion considers the defendants' answers together with the complaint, so we take into account Officer Lee's Answer asserting the affirmative defense of qualified immunity in response to the section 1983 claims. *See* Defendant Officer Alice Lee's Answer to the Complaint at 12, 1:13-cv-00324 (filed July 11, 2013); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (holding that defendant bears the burden of pleading qualified immunity defense).

We hold that the complaint alleges action by Officer Lee that no reasonable officer would have taken, and thus was in violation of the Fourth Amendment and the common law. As discussed in more detail below, we remand the false arrest and imprisonment claims to the district court for further proceedings.[1]

---

[1] Because she did not raise them in her briefs on appeal, Hall forfeited her claims of intentional and negligent infliction of

### a. Section 1983 False Arrest Claim Against Officer Lee

Hall's first count charged Officer Lee under 42 U.S.C. § 1983 with false arrest in violation of the Fourth Amendment. Compl. ¶ 44. The Fourth Amendment requires probable cause for any arrest. *See Dunaway v. New York*, 442 U.S. 200, 208-09 (1979). Officers may conduct brief investigatory stops supported only by reasonable suspicion, *see Terry v. Ohio*, 392 U.S. 1, 27 (1968), which is a "less demanding standard than probable cause" in terms of both the reliability and the extensiveness of the information required. *Alabama v. White*, 496 U.S. 325, 330 (1990); *accord Navarette v. California*, 134

---

emotional distress, and negligence by Officer Lee. *See Terry v. Reno*, 101 F.3d 1412, 1415 (D.C. Cir. 1996). Hall argues that she preserved those claims on appeal by broadly contending that "[t]he trial [c]ourt had no legal basis to dismiss any of the Appellant's claims," and that "absolutely no basis whatsoever existed for judgment on the pleadings in any respect." Appellant Br. at 5, 8; *see* Reply Br. at 6-7. The first statement appeared in the summary of argument and the latter in a section heading. Without any arguments advancing the disputed claims, such blanket, conclusory assertions are insufficient to preserve them. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008); *see also Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008).

Hall also failed to preserve her negligence claim against the District. Although she did include in her appellate brief a cursory discussion of that negligence claim, *see* Appellant Br. at 11, Hall did not defend it before the district court, *see Hall*, 73 F. Supp. 3d at 122; *see also* Opposition to Motion for Judgment on the Pleadings, 1:13-cv-00324 (filed May 6, 2014). It is therefore forfeited. *See District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.").

S. Ct. 1683, 1687 (2014). In her deposition, Officer Lee characterized her encounter with Hall as a justified *Terry* stop. *See* Lee Dep., 25:20-21. But the character of Officer Lee's seizure of Hall does not turn on whether she intended it to be an arrest. And, tellingly, Officer Lee does not maintain on appeal that the encounter was an investigative stop rather than an arrest. Instead, she argues only that the facts pleaded demonstrate that she acted with probable cause to arrest Hall. *See* Appellee Br. 19.

For purposes of the Fourth Amendment, a stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985). The point at which an investigative stop becomes an arrest is not marked with a bright line. *See id*. Rather, the Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id*. In other words, investigative detention must last "no longer than is necessary to effectuate the purpose of the stop." *United States v. Hutchinson*, 408 F.3d 796, 800 (D.C. Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).

Relevant to that inquiry, and particularly germane on these alleged facts, is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. An investigatory stop "to maintain the status quo momentarily while obtaining more information" would have been "most reasonable in light of the facts known to [Lee] at the time." *Adams v. Williams*, 407 U.S. 143, 146 (1972). Hall's complaint alleges that Lee did not, however, undertake even the most basic means of investigation that could "confirm or dispel [her]

suspicions quickly." *Sharpe*, 470 U.S. at 686; *accord* Compl. ¶ 23. Officer Lee did not attempt to verify Cities' contentions before handcuffing Hall, forcibly removing her from the bar, and putting her in the police cruiser. Compl. ¶¶ 23-28. And Lee failed to ask simple questions that might have uncovered that Hall had already provided her credit card, Cities may have already charged $935.04 to that card, Hall never actually refused to pay or left under circumstances suggesting she did not intend to return to settle her bill, and Hall's friends were still present and might have had the authority and intention to pay or to contact Hall to confirm her intentions. *See Id.* ¶¶ 19, 35. Moreover, Lee detained Hall for forty-five minutes, which a jury could find to be far longer than reasonably necessary to effectuate the purposes of an investigative stop, particularly given that the police found Hall close to Cities and all the relevant witnesses. On the facts as alleged, Officer Lee's detention of Hall amounted to an arrest.

We are mindful that courts should not indulge in "unrealistic second-guessing" of an officer's assessment in a "swiftly developing situation." *Sharpe*, 470 U.S. at 686. But here, on the facts as pleaded, the matter was quickly resolved once the police asked Hall a few, basic questions. In other words, we need not indulge any counterfactuals. Another officer's actions at the scene show that, if Officer Lee had simply asked Hall about the bill Cities claimed that Hall refused to pay, Lee quickly would have discovered that Hall's arrest and detention were unnecessary and unjustified.

Having concluded that Hall's detention was an arrest, not a mere investigatory stop, we consider whether Officer Lee acted with the requisite probable cause. Whether an officer acted with probable cause is an objective inquiry, dependent on whether the officer acted on the basis of "reasonably trustworthy information . . . sufficient to warrant a prudent

[person] in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The precise point at which probable cause arises is "fluid," and requires a "totality-of-the-circumstances analysis." *Illinois v. Gates*, 462 U.S. 213, 232, 238-39 (1983).

Probable cause to arrest requires at least some evidence supporting each element of the offense. The complaint alleges Officer Lee told Hall she was being detained for committing "[t]heft of services." Compl. ¶ 24. *Prima facie* evidence of theft of services is evidence that "a person obtained services that he or she knew or had reason to believe were available to him or her only for compensation," but the person "departed from the place where the services were obtained knowing or having reason to believe that no payment had been made for the services rendered." D.C. CODE § 22-3211(c). According to the complaint, the officers acted on the basis of a phone call from Cities accusing Hall of theft of services. *See* Compl. ¶ 36. The complaint alleges the call was placed after Cities had already charged Hall's bill to her card and received approval from the credit card company. The facts as alleged thus do not support the reported theft of services. There are no allegations, moreover, that officers took even the simplest steps to verify the details of the ostensible payment refusal. Taking the allegations of the complaint in the light most favorable to Hall and in the absence of information to corroborate Cities' assertions that Hall abandoned her bill, the district court could not conclude as a matter of law that the police had probable cause to conclude that Hall had committed or was committing theft of services.

A phone call from a member of the public lodging a complaint is not alone probable cause when the caller is not known to the police as reliable and when the complaint could readily be verified but is not (as here, where the police failed to

ask Hall whether she in fact refused to pay)—at least in a circumstance such as the complaint Cities lodged here, which did not implicate an emergency situation, threatening conduct, a matter of public safety, or similar urgent concerns. *See Adams*, 407 U.S. at 146-47 (known reliable informant's tip "that was immediately verifiable at the scene" supported reasonable suspicion to justify a stop, but "may have been insufficient for a[n] arrest or search warrant"); *see also Navarette*, 134 S. Ct. at 1692 (describing as a "close case," but finding police had reasonable suspicion for a brief investigative stop of vehicle based on anonymous 911 call reporting that a specific vehicle had run caller's car off the road); *Florida v. J.L.*, 529 U.S. 266, 272-73 (2000) (holding anonymous tip that accurately described subject's location and appearance, but did not show reliability in its "assertion of illegality," did not provide reasonable suspicion, while acknowledging potential "circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability."). If it were otherwise, members of the public could routinely call the police and, on the caller's word alone, get their enemies locked up.

The decisions of courts reviewing similar circumstances reinforce the inadequacy of the facts as alleged to show probable cause. In *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336 (7th Cir. 1985), police responded to a call from a manager at the Marketplace Restaurant who told them that five people consumed drinks, soups, and salads and left without paying. *Id*. at 1340. The manager described the suspects and their vehicles, said the suspects were staying overnight at a nearby camping area, and said they would press charges should the suspects be apprehended. *Id*. Police went to the campground, found the vehicles the manager had described, and knocked on the doors of the campers in which the suspects were sleeping. The officers entered the campers, asked whether the occupants

had been at the Marketplace Restaurant and, upon hearing they had, arrested them all. The officers took the suspects to jail where they detained them for approximately four hours. *Id*. at 1340-41.

The *Moore* court lamented that the "entire episode [might] have been avoided if the officer[s] . . . had used reasonable judgment and conducted a proper investigation, inquiring both as to the plaintiffs' presence in the restaurant and the dispute over the bill." *Id*. at 1345-46. The record showed the campers presented no risk of flight nor any danger to officers. There was no allegation of any serious crime; only a small dinner bill was at stake in the claimed theft of services. *Id*. at 1345. Therefore, the court determined, the deputies' investigation at the scene was potentially insufficient and the potential want of probable cause remained an open jury question. *Id*. at 1347.

Similarly, in *Allen v. City of Portland*, 73 F.3d 232 (9th Cir. 1995), a family of three attempted to use a half-price coupon to pay for part of their $25 meal. *Id*. at 234. The restaurant told them the coupon could not be used. *Id.* In protest, the family left $15 and the coupon to cover the meal. *Id.* The restaurant called 911 and reported a theft. *Id.* A responding officer testified that the reported theft "did not seem to be [of] a very large amount." *Id*. Nonetheless, officers tracked the family to a second restaurant where the family had relocated, followed one of the family members into the women's restroom, and "after a brief discussion told [the woman] that she was under arrest." *Id*. Before the arrest, the woman acknowledged that there had been a dispute over the cost of the meal and did not claim to have paid the full price demanded, but the court held that the officers lacked probable cause to arrest. *Id*. at 234-35.

When pressed at oral argument for any more direct support, the District of Columbia cited *Royster v. Nichols*, 698 F.3d 681 (8th Cir. 2012), but that decision also fails to support a determination that the officers had probable cause in this case. In *Royster*, the Eighth Circuit concluded that police had probable cause to arrest Royster for theft of services after he refused to sign his credit card receipt when prompted to do so by the police. *Id*. at 684-86, 689-90. Here, Hall did just the opposite.

Finally, Officer Lee asserts qualified immunity. Qualified immunity shields officers from suit for false arrest when, "in light of clearly established law and the information the [arresting] officers possessed," a reasonable officer could have believed the arrest was lawful. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *accord Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006). In other words, "if a reasonable officer could have believed that probable cause existed" to arrest Hall on the facts as Hall alleged them, Officer Lee would be entitled to immunity. *Hunter*, 502 U.S. at 228. Cities' phone call giving a one-sided and uncorroborated account of events was not "reasonably trustworthy information . . . sufficient to warrant a prudent [officer] in believing" that Hall committed theft of services. *Id*. No reasonable officer would have arrested Hall for theft of services, as Officer Lee did, without even attempting to verify that Hall indeed refused and did not intend to pay her bill.

Because on the allegations of the complaint Lee's detention of Hall constituted a *de facto* arrest, and Lee acted without probable cause or even a reasonable claim thereto, judgment on the pleadings was not warranted on Hall's section 1983 false arrest claim against Lee.

### b. Common Law False Arrest and Imprisonment Claims Against Officer Lee

The lack of probable cause for Hall's arrest also supports vacatur of the order dismissing on the pleadings Hall's common law false arrest and imprisonment claims.

Under D.C. common law, false arrest and false imprisonment are as a practical matter indistinguishable. *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010). The essential elements of liability are "(1) the detention or restraint of one against his or her will, and (2) the unlawfulness of the detention or restraint." *Id*. (quoting 32 AM. JUR. 2d § 7 (2007)); *see also Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 911-12 (D.C. Cir. 2015). The central question here is whether the arrest was justified—that is, whether it was supported by probable cause. As we discussed above, the allegations of the complaint do not show probable cause to arrest Hall. Accordingly, judgment on the common law false arrest and imprisonment claims against Officer Lee is vacated.

### III. Excessive Force Claims Against Officer Lee

Finally, we turn to the third question in our analysis: Did police use excessive force against Hall, or was their use of force justified by resistance on Hall's part? Hall's complaint alleged three counts that hinge on this question: Count I's section 1983 excessive force claim, Count II's common law assault claim, and Count III's common law battery claim.[2] The district court

---

[2] The district court dismissed the entirety of Count I on the pleadings based on its conclusion that the officers acted with probable cause to arrest Hall, seemingly confining its analysis to a section 1983 false arrest claim. *Hall*, 73 F. Supp. 3d at 120-21. It is not apparent why the court did not read Count I to assert a section 1983 excessive force

dismissed the excessive force and assault claims on the pleadings, and granted summary judgment against Hall on the battery claim. We review both types of disposition *de novo* and draw all inferences in Hall's favor. For the former, we look only to the facts as pleaded; for the latter, we have the benefit of evidence produced during discovery. *See Mpoy*, 758 F.3d at 287; *Robinson*, 818 F.3d at 8.

### a. Facts as Pleaded Support Claims of Unconstitutional Excessive Force and Common Law Assault

As pleaded, the facts relevant to Lee's use of force are as follows: Hall was in the bathroom of the bar across the street from Cities when there was a knock at the door, to which Hall responded, "Someone's in here." Compl. ¶ 21. Then came a louder knock and the statement, "It's the police." *Id*. "Immediately thereafter," without awaiting a response, Lee and her partner "broke down" the bathroom door, "threw [Hall] up against the bathroom wall," and handcuffed her. *Id*. ¶ 22. Lee then "dragged" Hall out of the restaurant. *Id*. ¶ 24. Outside the restaurant, Lee "continued to tighten the handcuffs on [Hall's] wrists to the point that [Hall] lost feeling in her thumb and hand and told [Lee] that she was hurting [Hall], but [Lee] still retained a firm grip on [Hall's] upper right arm, enough to leave a full handprint bruise." *Id*. ¶ 26. Lee then "dragged" Hall to a police cruiser and "threw" Hall in the back seat. *Id*. ¶ 28.

_____

claim as well. The complaint spells out that "Defendants Lee and John Doe substantially and meaningfully deprived Plaintiff of her right to be secure in her person under the Fourth Amendment, subjected Plaintiff to objectively excessive and excessive use of force which were unreasonable and constitute[d] an unlawful seizure." Compl. ¶ 45.

### i. Section 1983 Excessive Force

We analyze a section 1983 claim of excessive force in violation of the Fourth Amendment under the constitutional "objective reasonableness" standard. *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)); *accord Graham v. Connor*, 490 U.S. 386, 396 (1989). We assess whether the use of force was reasonable by balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tolan*, 134 S. Ct. at 1865 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). We pay "careful attention to the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Johnson v. District of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008) (first alteration in original) (quoting *Graham*, 490 U.S. at 396). "An officer's act of violence violates the Fourth Amendment's prohibition against unreasonable seizures if it furthers no governmental interest, such as apprehending a suspect or protecting an officer or the public." *Id*. at 976. Because Officer Lee raised a defense of qualified immunity, we analyze the excessive force claim with an additional layer of protection for the officer, asking whether the violated right was clearly established. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam); *Saucier*, 533 U.S. at 200-02.

The complaint alleges that Officer Lee "threw Plaintiff up against the bathroom wall," "dragged Plaintiff out of the [bar]," "tighten[ed] the handcuffs on Plaintiff's wrists to the point that Plaintiff lost feeling in her thumb and hand," "dragged Plaintiff to an empty parked police cruiser . . . and threw Plaintiff in the

back seat." Compl. ¶¶ 22, 24, 26, 28. It further alleges that Officer Lee thereby injured Hall's wrist. *Id*. ¶ 32. The complaint contains no indication that Hall posed any threat to Lee or others, or that Hall had committed a serious crime. On the facts as the complaint describes them, Lee's force was without justification, and the excessive force claim should not have been dismissed on the pleadings. We vacate the dismissal and remand the claim for further proceedings.

### ii.    Assault

The same allegations that support the claim of excessive force against Lee also require reversal and remand of the district court dismissal of the assault claim. "An assault is an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (internal quotation marks omitted). The district court held that the complaint fails to allege "that the officers made any threats of harm which were objectively unreasonable." *Hall*, 73 F. Supp. 3d at 121. We read the complaint to allege a course of conduct that conveyed a threat to Hall, reasonably causing her to fear for her safety. Officers broke down the bathroom door, threw Hall up against a wall, dragged Hall around, and tightened her cuffs when she protested that she was in pain. The officers did so abruptly and without warning, ignored her queries and objections, and refused to identify themselves or explain what was going on. Those allegations are fairly read to claim not only excessive use of force, but also a threatening message of more brutality in store for Hall if she questioned the officers' actions.

### b. Facts Revealed Through Discovery Support the Battery Claim Against Officer Lee

Hall's testimony corroborated and added detail to the complaint's allegations; nothing in discovery indisputably defeated any material aspect of the allegations that stated the excessive force claims. For instance, Hall testified that, after police knocked on the single-occupancy bathroom door and yelled, "Open up, it's the police," Hall let out a "small giggle," but before she "even ha[d] time to think about opening the door," the officers broke it down and slammed Hall against the wall. Hall Dep., 47:15-48:6. Hall testified that when she complained to Officer Lee "that the handcuffs were too tight," Lee told Hall to "shut up" and then Officer Lee "pushed the sides to tighten" the cuffs. *Id*. at 51:20-52:6. When Hall complained again and stated that her thumb was going numb, Lee told her to "[s]hut up" and "stop resisting." *Id*. at 54:7-11. Officer Lee twice tightened Hall's handcuffs in response to Hall's complaints. *Id*. at 73:10-18. Officer Lee forced Hall down on her knees on the concrete, scraping and bruising her. *Id*. at 80:19-22. Lee held Hall there with her knee in Hall's back. *Id*. at 58:17-19. When Hall attempted to stand up with her hands cuffed behind her, Officer Lee grabbed Hall by her elbows behind her back and "yanked" her up. *Id*. at 54:22. Eventually, Lee "drag[ged]" Hall to a police cruiser and threw her in the backseat. *Id*. at 63:12-13.

Two of Hall's friends who witnessed the scene corroborated her testimony. Kay Vollans, who was with Hall in the bathroom of the bar, testified that police kicked in the door and that Lee dragged Hall out of the bar. Vollans Dep., 23:15-23:17; 25:22-26:11, Mar. 19, 2015. Once outside, Vollans testified, Lee forced Hall to her knees on the concrete sidewalk, and lifted Hall's hands behind her back and pointed them to the sky while Hall was handcuffed. *Id*. at 29:17-20;

34:4-10. Hall's complaints of pain throughout the interaction were met with commands to shut up. *Id*. at 37:4-17. Gary Jones also testified that Lee dragged Hall out of the bar and that when Hall was on the ground, Lee put her knee in Hall's back while pulling Hall's arms up behind her by the cuffs. Jones Dep., 27:3-28:21; 36:16-18, Mar. 19, 2015.

Officer Lee's testimony characterized the interaction differently. She testified that her partner, a male officer, was the one who "grabbed" Hall in the bathroom and handcuffed her. Lee Dep., 25:1-8. Officer Lee testified that police handcuffed Hall because she fit the description of a black female wearing a yellow sundress who had reportedly committed "theft one of services," a felony. *Id.* at 25:14-18. According to Lee, Hall was considered a flight risk because she had left Cities. *Id*. at 26:4-16. Lee testified that she "placed" Hall down on the sidewalk; she later testified that she did so for fear that Hall might "stumble and fall," given her high heels. *Id*. at 65:18-66:2. And Lee testified that Hall was "screaming, and shouting, and fighting, and pulling away," and was generally "not compliant." *Id*. at 28:10, 65:15.

Finally, the parties devote multiple pages in their appellate briefs to arguing over the severity of Hall's wrist injury and its relevance to the analysis. *See* Appellant Br. 13 (arguing that Hall was diagnosed with and treated for a broken wrist); Appellee Br. 31-33 (arguing the "undisputed medical records show that Ms. Hall did not fracture her wrist"). The record shows that Hall was initially diagnosed with a potential wrist fracture, but that follow-up with a radiologist called that diagnosis into question. In any event, a reasonable jury could conclude on the summary judgment record that Hall experienced pain, numbness, limited mobility in her wrist and hand, and scrapes and bruises. The particular medical diagnosis of Hall's wrist injury is not determinative of whether

Officer Lee used excessive force. With the record evidence in mind, we move to the battery claim, dismissed by the district court at summary judgment.

Discovery corroborated Hall's allegations that Lee used force against her without justification, creating a jury issue on the battery claim. A police officer is liable for battery when she commits an "intentional act that causes harmful or offensive bodily contact" and when the officer's use of such force was "in excess of [that] which the actor reasonably believes to be necessary." *District of Columbia v. Chinn*, 839 A.2d 701, 705-06 (D.C. 2003) (quoting *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997)). "[T]he officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is [also] compared to that of a hypothetical reasonable police officer placed in the same situation." *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009).

The district court granted summary judgment to Officer Lee on the battery claim, reasoning that Hall's own testimony put beyond dispute that she was resisting arrest sufficiently to justify Lee's use of force. In our view, however, a reasonable jury could reject Officer Lee's contention that, starting when Hall did not immediately open the bathroom door in response to the police directive to "[o]pen up," Hall resisted the officers and thereby justified their use of force. *See Hall*, 2016 WL 1452325, at *2. The record could support a jury determination that the officers did not give Hall an opportunity to comply with their command to open the bathroom door before "bust[ing]" through the door. *See* Hall Dep., 48:3.

The district court also concluded that the record placed beyond dispute that Hall resisted arrest after she was handcuffed on the ground because, as the district court put it,

she "moved and behaved in ways that a police officer could reasonably conclude were meant to defy arrest." *Hall*, 2016 WL 1452325, at *3. The court recounted that Hall's testimony showed that she "tried to stand after Lee had forced her to kneel, and moved abruptly, even 'swing[ing] around,' during the arrest." *Id*. Reasonable jurors could disagree, however, whether Hall's movements were resistant, and whether Officer Lee's use of force was an appropriate response. Hall testified that she complained about her handcuffs being too tight, and that Lee responded by tightening the handcuffs. Hall Dep., 51:20-52:6. Hall tried to stand up because her knees were cut from being forced to kneel on concrete, in response to which Lee "grabbed [Hall by her] elbows and yank[ed her] up." *Id*. at 54:17-22. Hall's friends both corroborated Hall's testimony. And, given Officer Lee's failure to explain to Hall that she was under arrest or to articulate why Hall was being detained—beyond saying "theft of services," which Hall apparently heard as "[t]hat's the services," *id*. at 50:2-4—a jury could determine that Hall's attempts to view Lee's badge number were appropriate, non-resistant conduct. Most importantly, a reasonable jury could find on these facts that Officer Lee should have perceived that she could resolve the situation without physical force. At summary judgment, when we are required to view the record in the light most favorable to Hall, we cannot say that a reasonable jury would be required to find that, given Hall's conduct, Officer Lee's force was justified.

## Conclusion

We affirm summary judgment on the negligence, negligent and intentional infliction of emotional distress, and defamation claims against Seyhan Duru. We affirm, as forfeited on appeal, dismissal of the negligence claim against the District and Officer Lee as well as the negligent and intentional infliction of emotional distress claims against Lee.

We vacate the district court's grant of summary judgment to Cities on the negligence, conversion, and defamation claims against it. We also vacate the dismissal of Hall's section 1983 excessive force and false arrest, common law false arrest and imprisonment, and assault claims against Officer Lee. Finally, we vacate summary judgment on the battery claim against Officer Lee. We remand the surviving counts to the district court for further proceedings.

*So ordered.*