*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-111

MITCHELL A. KATZ, APPELLANT,

v.

DISTRICT OF COLUMBIA, *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2015-CAB-5304)

(Hon. Jeanette J. Clark, Motions Judge)
(Hon. Florence Y. Pan, Motions Judge)

(Argued September 11, 2019                    Decided December 15, 2022)

*David C. Tobin*, with whom *Javad Khan* was on the brief, for appellant.

*Richard S. Love*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General at the time of argument, and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, *Associate Judge*, and WASHINGTON, *Senior Judge*.

BECKWITH, *Associate Judge*: Appellant Mitchell Katz challenges the grant of

summary judgment to the District of Columbia and Metropolitan Police Department

(MPD) Officers Gerri Cherry, Tanya Butler, and Travis Maguire on various claims arising from his arrest following an altercation with Rafeena Ahmad and Philip Goyette. We affirm in part and reverse in part.

## I.

The facts surrounding the circumstances of Mr. Katz's arrest remain heavily disputed at this stage. As we are reviewing a grant of summary judgment, we view the evidence in the light most favorable to Mr. Katz, the party opposing the motion. *See Kotsch v. District of Columbia*, 924 A.2d 1040, 1042 (D.C. 2007).

### A. The Altercation Between Mr. Katz and Mr. Goyette

Mr. Katz testified in his deposition to the following events. Early one summer morning in 2014, Mr. Katz left the Heist nightclub with a group of acquaintances, one of whom hailed a taxi van. Mr. Katz watched his friends enter the rear driver's side door and walked around the vehicle to enter the rear passenger door, but his entry was blocked by Mr. Goyette, who began to argue with Mr. Katz over who had hailed the taxi. Mr. Katz pointed out that his group was already in the taxi and tried to squeeze past Mr. Goyette, who then elbowed Mr. Katz hard enough to leave a bruise, knocking the wind out of him and causing him to fall. As Mr. Katz fell backwards, he grabbed Mr. Goyette's backpack in an attempt to maintain his balance, but both of them fell into a sidewalk planter.

When he stood up, still arguing with Mr. Goyette, Mr. Katz saw that the taxi had departed. Ms. Ahmad, who had been standing with Mr. Goyette, also began yelling at Mr. Katz. Mr. Katz walked away from them and attempted to hail his own taxi. Mr. Goyette and Ms. Ahmad followed him and asked for his business card, stating that Mr. Goyette's computer broke when Mr. Katz pulled him down. Mr. Katz felt threatened because Mr. Goyette and Ms. Ahmad were both screaming and challenging Mr. Katz to fight. Mr. Katz asked them to leave him alone multiple times and kept walking away from them, but Mr. Goyette, Ms. Ahmad, and two of their friends continued to pursue and provoke him, "circling [him]" such that he could not get away.

As the argument got "much louder," Mr. Katz saw Mr. Goyette raise a skateboard "over his head like [he was] going to strike [Mr. Katz] with it." As Mr. Katz was turning to face Mr. Goyette in order to protect himself from the skateboard, Ms. Ahmad tore off Mr. Katz's shirt, scratching his chest. "Almost instantaneously," Mr. Goyette hit Mr. Katz's right shoulder with the skateboard, knocking him to the ground and causing more bruises. Mr. Katz got up "very quickly" and ran away from the group when "[t]here was an opening."[1]

---

[1] Mr. Goyette testified to a different version of this altercation by the taxi, which we need not recount in detail but address below to the extent it affected officers' perception of events.

## B. The Encounter with MPD Officers

Mr. Katz testified at his deposition that as he was running, he saw some police cars in the middle of the road and "ran [down Connecticut Avenue] to them," with Mr. Goyette chasing "right behind [him]" and "swinging the skateboard." Mr. Katz "ran to the police for help," telling the group of "[t]hree or four" officers that he had just been attacked. In response, the officers put him in handcuffs "just seconds" later, without first asking any questions. Mr. Katz testified that the officers "did not tell [him he] was under arrest," but told him that they placed him in handcuffs "[f]or everybody's protection, and they were going to investigate." While in handcuffs, Mr. Katz told the officers the details of the attack, informing them that he was scratched when his shirt was ripped off of him.

Mr. Katz testified that he repeatedly complained to all of the officers present that the handcuffs were too tight. He stated that less than half an hour after being handcuffed, an African American male officer "slammed" him into the back of a police car, causing pain to his chest, and made an adjustment to the handcuffs that "didn't exactly loosen" them. Mr. Katz "continue[d] to complain that the handcuffs were tight" until an officer eventually "loosened them." Mr. Katz testified that it "felt like a long time" between when he was slammed against the police car and when the cuffs were loosened. His wrists were sore and had "red indentions" [sic]

on them for "[a] couple days" after the incident, and his shoulders were sore for four or five days from having his arms tightly pushed behind him.

Other individuals testified to a different version of events surrounding Mr. Katz and Mr. Goyette's encounter with the officers. Mr. Goyette testified in his deposition that Mr. Katz changed his direction as the two were running to turn toward the group of officers. Mr. Goyette testified that he told officers, "He just punched my girlfriend" (referring to Mr. Katz), and that Mr. Katz was "detained" at the moment the police "ascertained the situation." Once Mr. Goyette had told officers that Mr. Katz had punched his girlfriend—but had provided no other information to the police—Mr. Katz was "clearly in the custody of police" and Mr. Goyette was permitted to leave to "go back and check on [Ms. Ahmad]."[2] Mr.

---

[2] We note that the full transcript of Mr. Goyette's deposition is not in the record on appeal, and it does not appear to have been presented to the trial court in ruling on the motions for summary judgment (the same is true of Officer Cherry's and Sergeant Maguire's depositions). In the light favorable to Mr. Katz, Mr. Goyette's testimony suggests that Mr. Katz was handcuffed before police officers had heard anything from Mr. Goyette except that Mr. Katz had "punched [his] girlfriend"—Mr. Goyette also testified that police did not take a "formal statement" from him until he was back with Ms. Ahmad. Mr. Goyette's testimony on this sequence of events was as follows:

> Q: Okay. So you said, "He just punched my girlfriend," twice; Mr. Katz stopped.
>
> A: Yes.
>
> Q: And then what happened?

Goyette noticed Mr. Katz being placed in handcuffs as he walked away to check on

Ms. Ahmad.

The record includes two sources of testimony from Officer Cherry:  her

testimony at Mr. Katz's subsequent criminal trial and her deposition in this case.  At

Mr. Katz's trial, Officer Cherry testified that she saw Mr. Katz and Mr. Goyette

running down Connecticut Avenue, and "the manner in which [Mr. Goyette] was

---

A:  He was—from what I could tell, he was clearly in the custody of police . . . and they allowed me to go check on [Ms. Ahmad].

Q:  Okay.  What was the next thing you said to the police after, "He just punched my girlfriend," twice?  After you said that twice, what was the next interaction you had with any police officer?

A:  I think they said, "What happened"—I think I—I don't—I can't say specifically because it had been clarified what happened already

 . . . .

Q:  At any point did you notice the police officers putting handcuffs on Mr. Katz?

A:  I believe, as I walked away, yes.

Q:  About how long would you say that was from the point where you yelled, "He just punched my girlfriend"—how long after that did you notice them put the handcuffs on Mr. Katz?

A:  I can't say specifically.

holding the skateboard" above his head caused her to stop the two men as she was not "completely sure what was going to happen next." Mr. Katz appeared to be "trying to get away from [Mr. Goyette] for whatever reason" and Mr. Goyette appeared "pretty upset" and was "chasing behind" Mr. Katz like he was "trying to stop him." She testified that neither individual called out to the officers as they were running.

In her deposition, Officer Cherry again testified that she could not initially determine whether Mr. Goyette was wielding the skateboard defensively or offensively. She and another officer crossed the street to apprehend the men, and yelled at them to stop. She then interviewed Mr. Goyette, who claimed that Mr. Katz had shoved him by the taxi, then started following him and Ms. Ahmad as they began to walk away, running up to Ms. Ahmad and punching her in the face after she asked Mr. Katz to leave them alone. When Officer Cherry asked Mr. Goyette why he was running down the street with a skateboard, he stated that "he was chasing or trying to stop Mr. [Katz] from getting away out of self-defense." After hearing Mr. Goyette's account of the incident, Officer Cherry interviewed Mr. Katz while Mr. Goyette stood by. According to Officer Cherry, Mr. Katz did not tell her he had been attacked and she did not initially notice any injuries on him. She then

interviewed Ms. Ahmad and a cab driver who claimed to have witnessed the assault,[3] while Sergeant Maguire, who was the supervising officer on the scene, stayed with Mr. Katz. To Officer Cherry's knowledge, Mr. Katz was not in handcuffs at that time. Officer Cherry then conducted a show-up with Ms. Ahmad and Sergeant Maguire conducted a show-up with Mr. Goyette.[4] Both Ms. Ahmad and Mr. Goyette identified Mr. Katz, and Officer Cherry told them they were free to leave.

According to Officer Cherry's deposition testimony, she then informed Mr.

---

[3] Sergeant Maguire testified that a cab driver flagged him down and told him, "A man just assaulted a male and female around the corner that were trying to get into my taxicab." According to Sergeant Maguire, this conversation with the cab driver occurred a matter of seconds before Sergeant Maguire saw Mr. Katz running southbound on Connecticut Avenue.

Officer Cherry, on the other hand, testified that she was flagged down by a cab driver in a moving cab *after* police stopped Mr. Katz and Mr. Goyette and while Officer Cherry was walking over to speak with Ms. Ahmad. Officer Cherry testified that the driver yelled, "Officer, Officer, I just witnessed that man get assaulted," and she had him pull over and park his vehicle until she could return to speak with him. When she later spoke to him, he "stated that he was the cab that [Mr. Goyette and Ms. Ahmad] had flagged down and the assault took place at his cab." He saw a man push Mr. Goyette to the ground, and then he drove off after an argument ensued between the man and the couple. He told Officer Cherry that he then circled back around and saw Officer Cherry walking with Mr. Goyette, which is when he flagged her down.

[4] Sergeant Maguire testified, however, that he did not recall a show-up at the time that Officer Cherry's police report indicated. He testified that had he indeed performed a show-up, he would have been called to Mr. Katz's criminal trial, but he was not.

Katz "that he was going to be placed under arrest for simple assault." She testified that she conducted a warrantless arrest because, after interviewing the witnesses including the cab driver, she concluded that Mr. Katz might "possibly assault someone else." While Mr. Katz was in Officer Cherry's presence, however, she did not perceive him as presenting a threat to anyone's wellbeing. Officer Cherry testified that a male officer handcuffed Mr. Katz at the time she told Mr. Katz he was being arrested. Mr. Katz then began to complain about pain to his chest, and Sergeant Maguire noticed a scratch on Mr. Katz's chest at that time and filled out an incident report accordingly.[5] Officer Cherry testified that she did not hear Mr. Katz complain about the handcuffs being tight.

Sergeant Maguire testified that he did hear Mr. Katz complain about the tightness of the handcuffs. After Mr. Katz complained, Sergeant Maguire "checked the handcuffs to make sure that they were double-locked and that there was adequate spacing, which would be the pinky's width between [Mr. Katz's] wrist bone and the handcuff inner diameter." Sergeant Maguire testified that he determined that the handcuffs were "properly applied" and that he "tried to explain to [Mr. Katz that] handcuffs are extremely uncomfortable." He also testified that he "kept on trying to

---

[5] Sergeant Maguire, on the other hand, testified that he had observed that Mr. Katz's shirt was ripped and his chest scratched "as soon as he first came in contact with [Mr. Katz]."

reassure [Mr. Katz] that [he] underst[ood] it's extremely painful, it's just how handcuffs feel, and that they definitely were put on properly" and would be "taken off as soon as possible." It is not clear from the portions of the deposition testimony in the record when this conversation occurred.

## C. Aftermath of the Arrest

The following facts are not in dispute. According to Mr. Katz's deposition testimony, officers put him into a police transport van, still handcuffed, and brought him to a hospital to treat his scratch wound. Mr. Katz "was in police custody the entire time" he was at the hospital, "handcuffed to . . . a hospital bed with two officers by [his] side." He first realized he was being charged with a crime after an officer told him he would be "processed." Mr. Katz was transported to the police station and released from custody "the next day." He testified that he missed several days of work, missed opportunities for potential income, and experienced sleeplessness and anxiety because of his injuries, his arrest, and his subsequent prosecution.

Mr. Katz was charged with two counts of simple assault, one for shoving Mr. Goyette to the ground and one for punching Ms. Ahmad in the face. Officer Cherry is listed as the arresting officer on his arrest and prosecution report. Sergeant Maguire and Officer Butler are listed as officers on the scene. Mr. Katz was

acquitted of both charges in a bench trial in November 2014.[6]

Eight months after his acquittal, Mr. Katz filed a complaint against the District, Officer Cherry, Officer Butler, and Sergeant Maguire, alleging violations of the U.S. Constitution, actionable under 42 U.S.C. § 1983, and District common tort law.[7]  Specifically, he alleged that the officers violated his Fourth Amendment right to be free from unreasonable seizure by seizing and prosecuting him in the absence of probable cause and by using excessive force and that they committed the common law torts of false arrest, malicious prosecution, assault and battery, and negligence.  He also sued the District on a theory of respondeat superior and for negligently hiring, training, retaining, or supervising the officers.

The District and the officers filed a motion to dismiss for failure to state a claim upon which relief can be granted under Super. Ct. Civ. R. 12(b)(6).  The trial court treated the motion to dismiss as a motion for summary judgment without first notifying the parties that it would do so.[8]  The court granted summary judgment to

---

[6] The criminal trial judge found Mr. Katz's testimony "reasonably credible" and Mr. Goyette's and Ms. Ahmad's testimony "incredible."

[7] Mr. Katz's complaint also sought damages from Ms. Ahmad and Mr. Goyette.  The parties stipulated to the dismissal of Ms. Ahmad and Mr. Goyette, and the claims against them are not at issue in this appeal.

[8] The trial court's stated reason for doing so was that Mr. Katz attached the MPD Arrest/Prosecution Report, which "was not included on the face of the

the District on the § 1983 claims against it and on the negligent hiring, training, retention, and supervision claim. It also granted summary judgment to Officer Butler and Sergeant Maguire on all counts against them. Finally, it granted summary judgment to all defendants on the negligence count. The court allowed the following counts to proceed: the common law false arrest count against the District and Officer Cherry, the § 1983 wrongful arrest count against Officer Cherry, the common law malicious prosecution count against the District and Officer Cherry, the § 1983 malicious prosecution count against Officer Cherry, the assault and battery count against the District and Officer Cherry, and the excessive force count against Officer Cherry.

After discovery on the remaining claims, the parties filed cross-motions for summary judgment in August 2017.[9] On January 24, 2018, the trial court denied Mr. Katz's motion for summary judgment, granted the defendants' motion, and entered judgment in favor of the District and Officer Cherry on all of the claims. This appeal followed.

---

Amended Complaint," as an exhibit in his opposition to the motion.

[9] The case was transferred from Judge Jeanette Clark to Judge Florence Pan in March 2017.

## II.

Mr. Katz argues that the trial court erred both in treating the defendants' motion to dismiss as a motion for summary judgment in its April 1, 2016, order and in granting summary judgment to the defendants on the remaining claims in its January 24, 2018, order. We begin with Mr. Katz's challenge to the trial court's January 2018 grant of summary judgment to the defendants.

We review the grant of a motion for summary judgment de novo. *Franco v. District of Columbia*, 39 A.3d 890, 894 (D.C. 2012). In doing so, "we conduct an independent review of the record, and apply the same standard as the trial court in considering the motion for summary judgment." *Kotsch*, 924 A.2d at 1044. "At the summary judgment stage, the trial court does not make credibility determinations or weigh the evidence, which are functions reserved for the trier of fact." *Sibley v. St. Albans Sch.*, 134 A.3d 789, 809 (D.C. 2016). Instead, the evidence must be viewed in the light most favorable to the party opposing the motion for summary judgment. *Franco*, 39 A.3d at 894. Summary judgment is proper if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Kotsch*, 924 A.2d at 1044–45. If a reasonable jury could return a verdict for the nonmoving party, there is a genuine dispute that precludes summary judgment. *See Sibley*, 134 A.3d at 809.

**D.  Section 1983 Unlawful Arrest Claim Against Officer Cherry**

In his § 1983 unlawful arrest claim, Mr. Katz seeks to vindicate a purported violation of his Fourth Amendment rights.  He argues that the trial court erred in determining that Officer Cherry was entitled to qualified immunity on this claim.

"The defense of qualified immunity shields government officials performing discretionary functions from liability for damages in actions brought under 42 U.S.C. § 1983 provided their conduct does not violate clearly established federal constitutional or statutory rights of which a reasonable person would have known." *Young v. Scales*, 873 A.2d 337, 341 (D.C. 2005).  An officer is immune from suit unless (1) "the plaintiff's allegations, if true, show that the officer's conduct violated a constitutional or statutory right" and (2) "the right that had been violated was clearly established at the time the alleged violation occurred."  *Scales v. District of Columbia*, 973 A.2d 722, 727 (D.C. 2009).  We may begin with either inquiry, *id.* at 727 n.3, and so start with the first.

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  Mr. Katz contends that he was subjected to an unreasonable seizure when he was handcuffed upon approaching the group of officers, before any investigation occurred.  It is undisputed that there was not probable cause at this time.  Thus, whether Mr. Katz's seizure violated his Fourth Amendment rights turns

on whether the handcuffing was reasonable as part of an investigative detention under *Terry v. Ohio*, 392 U.S. 1, 19–22 (1968).[10]

Under *Terry*, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). To come within the purview of *Terry*'s "narrow exception to the Fourth Amendment's probable cause requirement," police action must be (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which initially justified the detention." *Womack v. United States*, 673 A.2d 603, 608 (D.C. 1996).

As we have no argument before us that Officer Cherry did not have the requisite suspicion to detain Mr. Katz initially, we focus our analysis on the second prong. "A *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope

---

[10] When Mr. Katz attempted to press this argument that the arrest occurred at the moment he was handcuffed in opposing the motion for summary judgment, the trial court considered the argument waived. Nevertheless, the trial court concluded as a matter of law that "the detention with handcuffs . . . was a *Terry* stop" and that Mr. Katz was not "actually placed under arrest" until the investigation had taken place. Thus, this issue is properly before us. *See District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 33 n.3 (D.C. 2001) ("[E]ven if a claim was not pressed below, it properly may be addressed on appeal so long as it was passed upon.").

or manner of execution." *United States v. Johnson*, 592 F.3d 442, 451 (3d Cir. 2010); *see also Florida v. Royer*, 460 U.S. 491, 499 (1983) (noting that *Terry* and its progeny do not permit police to "seek to verify their suspicions by means that approach the conditions of arrest"); *Dunaway v. New York*, 442 U.S. 200, 210 (1979) (describing *Terry* as applicable to "'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test"). "It is the [officer's] burden to demonstrate that [a] seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 500. "[W]hen officers subject a detained suspect to a greater restraint on his liberty than is permissible in a legitimate *Terry* seizure, articulable suspicion is not sufficient, and the Constitution requires a showing of probable cause." *Womack*, 673 A.2d at 608.

"The measure of the scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances." *In re M.E.B.*, 638 A.2d 1123, 1127 (D.C. 1993). Circumstances to consider include protection of the officer, as well as whether the suspect "attempted to resist police, made furtive gestures, ignored police commands, attempted to flee, or otherwise frustrated police inquiry." *Womack*, 673 A.2d at 609; *see also M.E.B.*, 638 A.2d at 1127 (calling officer safety "a significant factor to be weighed in

determining whether the restraint chosen by the officers converts the stop to an arrest"). We must consider these circumstances from the "perspective of a reasonably prudent officer . . . on the scene." *Womack*, 673 A.2d at 610. Officers must "be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of [handcuffs] was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." *United States v. Mohamed*, 630 F.3d 1, 7 (1st Cir. 2010) (quoting *United States v. Acosta-Colon*, 157 F.3d 9, 18-19 (1st Cir. 1998)); *see also United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013) (noting that the use of handcuffs in a *Terry* stop "is not always unconstitutional, . . . at least where police officers can point to specific reasons for believing that handcuffing the particular person during the stop was needed for safety or to prevent flight"). "While there is no categorical rule that an officer's decision to place a suspect in handcuffs *always* transforms the interaction for a *Terry* stop into an arrest, it is the 'rare case' in which 'common sense and ordinary human experience convince us that an officer believed reasonably than an investigative stop could be effectuated safely only in this manner.'" *Mwangangi v. Nielsen*, 48 F.4th 816, 827 (7th Cir. 2022) (quoting *United States v. Glenna*, 878 F.2d 967, 973 (7th Cir. 1989)).

The appellees at no point argue that handcuffing Mr. Katz immediately was

reasonably related to the reasons for stopping him. Instead, they argue that the handcuffing was part of a *Terry* stop—and so did not constitute an arrest—because Mr. Katz was not told that he was under arrest and "never testified that he believed he was immediately placed under arrest."[11] Neither of these facts automatically makes handcuffing without probable cause reasonable.[12] *See Giles v. United States*, 400 A.2d 1051, 1053-54 (D.C. 1979); *M.E.B.*, 638 A.2d at 1126-27 (noting that it was "not controlling" in determining whether a seizure was a *Terry* stop or an arrest that the handcuffed individuals were "specifically told they were not under arrest"); *United States v. Bailey*, 743 F.3d 322, 341-42 (2d Cir. 2014) (holding that handcuffing transformed *Terry* stop into arrest notwithstanding the fact that suspect was told he was not under arrest). The appellees also cite the trial court's reference to cases finding the use of handcuffs "appropriate for safety purposes." But they provide no reason that handcuffing Mr. Katz immediately was reasonable for safety

---

[11] The appellees rely on the trial court's factual conclusion that police "explicitly told [Mr. Katz] that he was not under arrest," but Mr. Katz did not testify that he was told that he was *not* under arrest. His testimony was that "They did not tell me I was under arrest."

[12] Whether an individual believed himself to be under arrest is central to the Fifth Amendment custody inquiry. Even in that distinct context, however, an officer's statement that the individual is not under arrest is not dispositive. *Broom v. United States*, 118 A.3d 207, 216 (D.C. 2015). And under the Fourth Amendment, the central question is not how the officer's actions would make someone feel but whether those actions "were reasonable—i.e., whether they were taken with adequate justification." *White v. United States*, 68 A.3d 271, 283-84 (D.C. 2013).

purposes aside from the fact that "what Officer Cherry first heard upon stopping both individuals was Mr. Goyette's allegation 'that Mr. Katz had just assaulted him and his girlfriend.'"

First, we disagree with the appellees that there is no material factual dispute as to what Officer Cherry had heard at the time Mr. Katz was handcuffed. Mr. Katz testified that he told the police he had been attacked when he reached them. It is undisputed that Officer Cherry was in that group of officers, and nothing in the record indicates that, at that late hour, she would not have been able to hear someone who was speaking to officers as he approached. Mr. Katz was ahead of Mr. Goyette as the two approached the officers. And Mr. Katz testified that he did not hear Mr. Goyette say anything to officers at that time. A reasonable juror could rely on Mr. Katz's testimony to conclude that Officer Cherry had heard Mr. Katz's allegations at the time he was handcuffed. *See Fry v. Diamond Constr., Inc.*, 659 A.2d 241, 245 (D.C. 1995) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of [the] judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (alterations in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))).

Even if we take as undisputed that Officer Cherry had also heard Mr.

Goyette's account—that Mr. Katz "punched [his] girlfriend"[13]—at the time Mr. Katz was handcuffed, a jury could find this accusation insufficient to establish a safety justification for handcuffing Mr. Katz, in light of the totality of the circumstances. For one, a jury could find that it was not objectively reasonable in these circumstances to perceive Mr. Katz as the aggressor, given that he was running to a conspicuous group of police officers with a torn-open shirt, a scratched chest, and a skateboard-wielding man on his heels. Additionally, a jury could find that the allegations against Mr. Katz at that time did not provide objectively reasonable grounds to believe that Mr. Katz was armed or otherwise posed a danger to a group of multiple officers that could not be reasonably managed through less intrusive means than handcuffing until officers had more information. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005) (noting that conducting a pat-down during a *Terry* stop requires "a reasonable belief that the suspect is armed and dangerous; likewise, for the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose").

---

[13] Officer Cherry testified that she heard Mr. Goyette say that Mr. Katz "had just assaulted [Mr. Goyette] and his girlfriend." Mr. Goyette consistently testified that what he said to officers was, "He just punched my girlfriend"—he even corrected a deposing attorney who described what he said as, "He hit my girlfriend."

In some cases, the allegations that officers are investigating can contribute to a safety justification for handcuffing, either because individuals were reported to be armed or because the crime at issue could be thought to involve dangerous weapons. *See Womack*, 673 A.2d at 609-10; *see also Hicks v. United States*, 730 A.2d 657, 661 (D.C. 1999) (focusing on whether responding officers could "reasonably assume [the crime] entailed the use of a weapon"). *Compare, e.g.*, *Cotton v. District of Columbia*, 541 F. Supp. 2d 195, 202-04 (D.D.C. 2008) (finding that a single officer responding to a "crowd" of people alleging an altercation involving a knife did not act unreasonably in handcuffing a person later determined to be the victim, and relying on the fact that the "altercation . . . reportedly involved a weapon"), *with, e.g.*, *Lundstrom v. Romero*, 616 F.3d 1108, 1123, 1126 (10th Cir. 2010) (finding that even "serious" allegations of child abuse did not make handcuffing a potential suspect reasonable). This is not such a case. If officers here had reason at the time they handcuffed Mr. Katz to suspect that he was involved in a crime, it was not one associated with the use of dangerous weapons.[14]  *Cf. Womack*, 673 A.2d at 610 (noting that detainee was "suspected of having committed violent and extremely

---

[14] Simple assault is a misdemeanor offense. *See* D.C. Code § 22-404(a)(1). It is not "an enumerated 'crime of violence' for purpose[s] of [the] sentence enhancement statute." *Hicks*, 730 A.2d at 661 (relying on the fact that "robbery" is an "enumerated 'crime of violence'"); *see* D.C. Code § 23-1331(4).

serious crimes, . . . all while armed with a handgun").

If the allegations against Mr. Katz did not establish serious safety concerns, neither did Mr. Katz's actions while in the presence of the police. Officer Cherry has not argued that any officer thought, based on Mr. Katz's gestures or demeanor, that Mr. Katz might be armed. Regardless, such a belief would have to be objectively reasonable. *See In re R.M.C.*, 719 A.2d 491, 495-96 (D.C. 1998) (concluding that officers' subjective belief that a suspect was armed was objectively unreasonable, and thus frisking and handcuffing him was impermissible). We see nothing in the record that could provide a reasonable basis to think that Mr. Katz was armed. Relatedly, nothing in the record suggests that Mr. Katz behaved erratically or resisted the officers in any way. To the contrary, there is evidence that Officer Cherry did not perceive Mr. Katz to be a danger to himself or others.[15] *See Womack*, 673 A.2d at 609 & n.10 (noting that "whether police officers in fact feared for their safety during an encounter with a suspect is not dispositive" but evidence about whether an officer felt threatened may be helpful to the factfinder in "explain[ing] the context of the encounter from [the officer's] point of view").

While the circumstances in which officers encounter a suspect have also

---

[15] Although Officer Cherry testified that she thought Mr. Katz "may possibly assault someone else," she came to this conclusion only after interviewing the witnesses, which—on Mr. Katz's account—happened after he was handcuffed.

affected courts' analysis of the reasonableness of handcuffing, Officer Cherry has not argued that any such circumstances gave rise to a safety justification here. This is not a case, for example, in which officers were in "unfamiliar surroundings." *Cf. id.* at 611. Nor did the officers need to move Mr. Katz from one location to another. *Cf. M.E.B.*, 638 A.2d at 1127 (finding handcuffing of two detainees suspected of involvement in a murder reasonable while transporting them, together, in the back of a patrol car so that a show-up could be conducted). And in the light favorable to Mr. Katz, he was handcuffed while in the presence of a "group" of officers that outnumbered Mr. Katz and Mr. Goyette. A jury could find that the presence of multiple officers substantially reduced any safety concerns. *Washington v. Lambert*, 98 F.3d 1181, 1189-90 (9th Cir. 1996) (considering the "number of police officers present" a relevant factor in "analyzing the reasonableness of the use of aggressive investigatory tactics as part of a *Terry* stop"); *cf. Coghill v. United States*, 982 A.2d 802, 809 (D.C. 2009) (considering the fact that an officer was alone with the suspect in finding handcuffing the suspect reasonable as part of an investigatory stop). While the situation the officers found themselves in may have been confusing and even tense, that does not justify handcuffing someone who himself presents no objective safety threat. *Cf. R.M.C.*, 719 A.2d at 493, 496 (finding that an officer who handcuffed a minor who was stopped on suspicion of a curfew violation so that the officer could help his partner, who was "engaged in 'a scuffle'" with one of the

minor's companions, acted unreasonably); *Lundstrom*, 616 F.3d at 1122-23 (rejecting officers' argument that handcuffing a woman "was reasonable based on their interest in securing the area around the house while they dealt with the volatile situation [her companion] presented" and the "confusing" nature of the situation).

Handcuffing is ordinarily improper in a *Terry* stop absent an objective safety concern. *See United States v. Smith*, 373 F. Supp. 3d 223, 241 (D.D.C. 2019); *Haynes v. Minnehan*, 14 F.4th 830, 835 n.4 (8th Cir. 2021) ("[A]bsent an objective safety risk, handcuffing is *not* a routine part of a *Terry* stop."). For the reasons stated above, a jury could find—notwithstanding the fact that officers told Mr. Katz that he was being handcuffed "for everybody's protection"—that it was unreasonable under the circumstances to think handcuffing Mr. Katz immediately was necessary for safety purposes.

Nevertheless, we have recognized that handcuffing can sometimes be a reasonable way for officers to "maintain the status quo" while diligently pursuing an investigation, such as where a suspect may attempt to flee. *See Womack*, 673 A.2d at 609. Taken in the light favorable to Mr. Katz, the facts do not suggest an investigative need for handcuffing, either. Mr. Katz's account—bolstered by Mr. Goyette's testimony that Mr. Katz turned *toward* the large group of officers—was that he was seeking out the police. A jury could find on these facts that the objective

risk of Mr. Katz fleeing was minimal and that handcuffing was not necessary to secure his presence. *Cf. Harris v. Byner*, No. 2:12cv591-MHT, 2014 WL 129040, at *5 (M.D. Ala. Jan. 14, 2014) (finding it "utterly incredible" that appellant "could have been a flight risk" given that he was the one who had called the police).[16] And Officer Cherry has pointed to no other facts suggesting that handcuffing Mr. Katz was reasonably necessary to allow officers to investigate.

In the absence of any objective reason to believe that Mr. Katz posed a safety risk or a flight risk or might otherwise frustrate police inquiry if not handcuffed, there was no reason to handcuff him *immediately*, before conducting "even the most basic investigation." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 458 (8th Cir. 2011). Particularly in light of the reasons to think that Mr. Katz might have been the victim of an offense rather than the perpetrator, it was unreasonable to handcuff Mr. Katz without asking him or anyone else a single question. *Cf. id.* (finding it unreasonable for an officer who was responding to a dispatch that stated that an individual was attempting to sell counterfeit watches to handcuff the suspect without first "pos[ing] a single question to [the suspect] or store personnel to ascertain the basis of the dispatch"); *Lundstrom*, 616 F.3d at 1123 (finding that officers responding to

---

[16] Although at oral argument the appellees repeatedly described the officers as seeing Mr. Katz "fleeing," this referred to fleeing from a man who was chasing him with a skateboard, not to fleeing from police.

"serious" allegations of child abuse acted unreasonably in handcuffing a woman before "undertak[ing] the most rudimentary investigation—asking [her] what happened"); *Hall v. District of Columbia*, 867 F.3d 138, 165 (D.C. 2017) (finding that allegations in complaint constituted de facto arrest where the officer "did not attempt to verify [the complainant's] contentions before handcuffing [the plaintiff]").

If a jury credited Mr. Katz's account, it could find that handcuffing was not reasonably necessary for officer safety or to maintain the status quo while officers sought more information. In the light favorable to Mr. Katz, handcuffing him was not "reasonably related in scope to the circumstances which justified the [stop] in the first place" and thus violated his Fourth Amendment right to be free from unreasonable searches and seizures. *Terry*, 392 U.S. at 20.

Having determined that Mr. Katz's version of the facts—if credited—constitutes a Fourth Amendment violation, we must determine "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Sabir v. District of Columbia*, 755 A.2d 449, 455 (D.C. 2000) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7,

11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). This requires that the legal principle be "dictated by 'controlling authority' or 'a robust "consensus of cases of persuasive authority."'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)). It also requires that "the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. Ultimately, while there need not "be 'a case directly on point,' existing precedent must place the lawfulness of the particular [conduct] 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741).

At the time Officer Cherry stopped Mr. Katz, it was clear that absent a safety or investigative justification, it was unlawful to handcuff someone without probable cause to believe they had committed or were about to commit an offense.[17] A preeminent treatise on the Fourth Amendment stated that "handcuffing of the suspect is not ordinarily proper" during a *Terry* stop, citing decisions of five federal appellate courts and six state supreme courts to that effect. Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* 408-09, 409 n.134 (5th ed. 2012). Resort to handcuffing, it provided, requires "special circumstances." *Id.* at 409-10,

---

[17] Again, while the appellees urge us to treat as undisputed Officer Cherry's testimony that she heard Mr. Goyette's claim that Mr. Katz had punched his girlfriend before Mr. Katz was handcuffed, they have at no point argued that this statement could furnish probable cause.

410 n.135. Well before the events here, this court noted that handcuffing is "a familiar feature of arrests" and described the "critical question" in determining whether handcuffing was within the permissible scope of a *Terry* stop as "whether a reasonably prudent officer would have been justified in using handcuffs to neutralize potential threats to his or her safety or to inhibit any attempt by the suspect to escape." *Womack*, 673 A.2d at 608-09.

It is clear from cases requiring "special circumstances" to justify the use of handcuffs that their use in a *Terry* stop is not permissible absent such circumstances. *See El-Ghazzawy*, 636 F.3d at 459-60 ("'It is well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety.' It follows that the converse is equally true: it is well established that if suspects are cooperative and officers have no objective concerns for safety, the officers may not use intrusive tactics such as handcuffing absent any extraordinary circumstances." (citation omitted) (quoting *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004))); *see also Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009) ("[A]ny reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion.").

When the facts are viewed in the light most favorable to Mr. Katz, any reasonable officer would also have known that such circumstances were not present in this case. *See Manzanares*, 575 F.3d at 1150 (rejecting the idea "that the existence of a grey area between arrests and investigative detentions means that no reasonable officer can ever understand that he has arrested a suspect"). On Mr. Katz's account, neither his conduct while in the presence of police nor the reason the police had for stopping him established an objective threat to anyone's safety or to the officers' ability to investigate the competing allegations before them. This court has found handcuffing reasonable only in cases where the detainee was suspected of a crime that officers could reasonably believe involved dangerous weapons or where the detainee had already attempted to flee from police.[18] Moreover, other jurisdictions

---

[18] *See M.E.B.*, 638 A.2d at 1127-28 (finding that where "the two detainees were suspected of possible involvement in a murder" and were to be taken by car "for a dozen or more blocks" to a show-up, there was a sufficient basis for the trial court to conclude that "handcuffing was a reasonable precaution under the circumstances"); *Womack*, 673 A.2d at 610 (finding that safety concerns justified handcuffing an individual in order to bring him outside for an identification where he was "suspected of having committed violent and extremely serious crimes, including rape, kidnapping, and robbery, all while armed with a handgun"); *Hicks*, 730 A.2d at 660-61 (finding handcuffing within scope of *Terry* where three suspects were detained late at night following a report of a robbery, which officers could "reasonably [have] assume[d] entailed the use of a weapon," and handcuffing was intended "to secure the safety of the officers, and the presence of the suspects," until the complaining witness could conduct an on-scene identification); *White v. United States*, 763 A.2d 715, 719, 721 (D.C. 2000) (finding that handcuffing the occupants of a car was reasonable in investigating a citizen's report that she was concerned that the occupants were going to shoot her nephew, where an officer testified to being

have found not only Fourth Amendment violations but clearly established ones where officers handcuffed compliant individuals before conducting any investigation. *E.g.*, *El-Ghazzawy*, 636 F.3d at 459-60; *Lundstrom*, 616 F.3d at 1125-26. In light of these cases, no reasonable officer could think that immediately handcuffing a (compliant) individual who sought out police for help and who was not believed to be armed was permissible. It was clear in the circumstances Mr. Katz describes that officers needed to conduct some investigation before handcuffing Mr. Katz.

We emphasize that this decision rests on the significantly disputed facts before us at this stage. *Cf. Gupta v. Melloh*, 19 F.4th 990, 996-1001 (7th Cir. 2021) (deeming qualified immunity on an excessive force claim improper where case law made clear that officers cannot lawfully use force without provocation or justification and material factual disputes remained about whether there was any justification in this case). Officer Cherry offered a vastly different account of what happened than Mr. Katz did. But we must "resist the allure of fact finding" and view

---

concerned for her safety given that the car was parked with the lights off in an area of an impound lot where the officer had never seen occupied cars parked, and the individuals ducked down in the car as police approached); *Coghill*, 982 A.2d at 808-09 (finding that handcuffing a man in the course of a *Terry* stop was reasonable where the man had just fled from police into the woods and the officer who found him there and handcuffed him was alone and unable to determine if the man—who refused to show his hands when repeatedly ordered to do so—was armed).

the circumstances in the light favorable to Mr. Katz. *Id.* at 996-97. Under that version of the facts, any reasonable officer would know that immediately handcuffing Mr. Katz violated his Fourth Amendment rights. The grant of summary judgment to Officer Cherry on the § 1983 unlawful arrest claim is thus reversed.

## E. Common Law False Arrest Claims Against Officer Cherry and the District

Mr. Katz also challenges the grant of summary judgment to the defendants on his common law false arrest claims. "The gravamen of a complaint for false arrest or false imprisonment [under District law] is an unlawful detention." *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010). The "central issue" is whether there was "legal justification" for the detention. *Id.* at 466 (quoting *Moorehead v. District of Columbia*, 747 A.2d 138, 147 (D.C. 2000)).

Mr. Katz argues that his detention was not legally justified because it failed to comport with either of the requirements in D.C. Code § 23-581(a)(1)(C). That provision establishes two criteria for warrantless arrests for misdemeanor assaults not committed in an officer's presence. First, the officer must have "probable cause to believe [the arrestee] has committed or is about to commit [the offense]." *Id.* Second, the officer must have probable cause to believe the person, "unless immediately arrested, may not be apprehended, may cause injury to others, or may tamper with, dispose of, or destroy evidence." *Id.* To defeat a common law claim

of false arrest, an officer must either show that both of these criteria are satisfied or show "that [she] reasonably believed, in good faith, that [her] conduct toward the plaintiff was lawful." *Enders*, 4 A.3d at 464 n.10, 466-67, 467 n.13; *see also Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978) (explaining that it is the defendant's burden to show legal justification for an arrest).

For the reasons discussed in connection with the § 1983 unlawful arrest claim, a jury could conclude that Mr. Katz's detention did not comply with the first requirement in D.C. Code § 23-581(a)(1)(C) because Mr. Katz was arrested the moment he was handcuffed—and thus without probable cause to believe he had committed or was about to commit an offense. *See Womack*, 673 A.2d at 608 (explaining that a stop evolves into an arrest requiring probable cause when the scope of police conduct is not reasonably related to the circumstances justifying the seizure); *see also Longshore v. State*, 924 A.2d 1129, 1145 (Md. 2007) ("Because Longshore was neither a flight nor safety risk, there was no justification for placing Longshore in handcuffs. This was, therefore, no mere detention; it was, in fact, an arrest. Consequently, to be a valid arrest, probable cause was required.").

Moreover, there are disputes of material fact about whether there was at any point—before or after the investigation—probable cause to believe that, "unless immediately arrested, [Mr. Katz] may not be apprehended, may cause injury to

others, or may tamper with, dispose of, or destroy evidence," as the second prong of D.C. Code § 23-581(a)(1)(C) requires. During Officer Cherry's deposition, in response to a question about whether she found that Mr. Katz met one of those criteria for warrantless misdemeanor arrest, she testified that after speaking with Mr. Goyette, Ms. Ahmad, and the taxi driver she concluded that unless she arrested Mr. Katz, he "may possibly assault somebody else." Even assuming that this belief, if reasonable, could constitute probable cause to think that Mr. Katz "may cause injury to others,"[19] a jury could find that such a belief was not warranted in the totality of the circumstances as Mr. Katz presents them. Officer Cherry also indicated that while Mr. Katz was in her presence, nothing about his demeanor, language, or behavior suggested that he posed a threat to anyone. In the light favorable to Mr. Katz, he was cooperative during the entire police encounter. A jury could also find that the fact that Mr. Katz sought out police made it unreasonable to believe that he

---

[19] It is not clear whether this conclusion was based on more than a "hunch." *See Tuckson v. United States*, 77 A.3d 357, 365 (D.C. 2013). It is also not clear whether it was based on anything other than the fact that these witnesses' statements established probable cause to believe that Mr. Katz had committed an assault. Although we need not address this legal question, such a basis for concluding that an individual poses a continuing danger may be insufficient. *See Williams v. District of Columbia*, 268 F. Supp. 3d 178, 188 (D.D.C. 2017) (noting that relying on the fact that the suspect had committed an assault to find that he may cause injury if not immediately arrested "is in significant tension with the text of the District's warrantless arrest statute" because "[i]f the underlying assault that is the predicate for the arrest were sufficient, on its own, to justify a warrantless arrest, that would render superfluous the other statutory bases for making a warrantless arrest").

posed a continuing threat, notwithstanding the statements of Mr. Goyette and Ms. Ahmad.

Even though a jury could find that one or both of the prongs of the warrantless misdemeanor arrest statute was not satisfied, Officer Cherry was entitled to summary judgment on Mr. Katz's common law false arrest claim if it was clear as a matter of law that she "believed, in good faith, that [her] conduct was lawful" and this "belief was reasonable." *District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C. 1993); *see also Enders*, 4 A.3d at 464 n.10 (describing this as an "alternate legal justification for an arrest"). Even if she subjectively believed that her conduct was lawful, however, a jury could find that this belief was not reasonable. That is because, as discussed above, it was clear at the time of this encounter that handcuffing an individual without probable cause or a safety or investigative reason was impermissible, and there are disputed facts about whether any such reason was present here.[20] There are also such significant factual disputes underlying the

---

[20] Our conclusion that Officer Cherry is not entitled to qualified immunity means the "good faith" defense must fail. We note, however, that the inverse is not always true. Because the "good faith" defense to common law false arrest has an explicit *subjective* requirement—and because our case law does not require that the objective reasonableness component of the "good faith" defense track the demanding contours of the Supreme Court's qualified immunity jurisprudence—an officer could be liable for common law false arrest even if she is entitled to qualified immunity on a § 1983 unlawful arrest claim.

circumstances of Mr. Katz's arrest that we hesitate to conclude as a matter of law that Officer Cherry had a subjective belief in the legality of her actions. *See Murphy*, 631 A.2d at 38-39 (finding the evidence "too equivocal to support a judicial determination that no reasonable juror could find" that officers had "at least a reasonable good faith belief that they were acting lawfully in [arresting appellant]," because appellant's testimony—which directly contradicted officers' and complainant's accounts—meant there was a possibility that officers seized appellant with "no ground for believing that [he] was breaking the law").

Summary judgment for Officer Cherry on the common law false arrest count was therefore improper. And, because the District "may be sued under the common law doctrine of respondeat superior for the intentional torts of its employees acting within the scope of their employment," *Wade v. District of Columbia*, 310 A.2d 857, 863 (D.C. 1973) (en banc), summary judgment for the District on this count was also improper. We reverse the grant of summary judgment to Officer Cherry and the District on the common law false arrest claims.

## F.  Malicious Prosecution Claims Against Officer Cherry and the District

We now turn to Mr. Katz's malicious prosecution claims, which he brought pursuant to both District law and 18 U.S.C. § 1983. Under District law, a claim for malicious prosecution requires "(a) a criminal proceeding instituted or continued by

the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding," and (d) malice. *DeWitt v. District of Columbia*, 43 A.3d 291, 296 (D.C. 2012) (quoting *Jarett v. Walker*, 201 A.2d 523, 526 (D.C. 1964)). In his § 1983 claim, Mr. Katz argues that the defendants violated his Fourth Amendment rights and deprived him of his liberty by initiating and maintaining a criminal prosecution against him without probable cause.[21] Both sets of claims fail, then, if there was probable cause to believe Mr. Katz had committed a crime at the time legal process was instituted against him.

"The issue in a malicious prosecution case is not whether there was probable cause for the initial arrest, but whether there was probable cause for the 'underlying suit.'" *Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007) (quoting *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1282 (D.C. 2002)). "In a civil action for malicious prosecution, probable cause is defined as the existence of 'facts and circumstances as will warrant a cautious man in the belief that his action and the

---

[21] The contours of a so-called § 1983 malicious prosecution claim remain somewhat unclear. *See Pitt v. District of Columbia*, 491 F.3d 494, 510-12 (D.C. Cir. 2007); *see also Manuel v. City of Joliet*, 137 S. Ct. 911 (2017). What *is* clear is that Mr. Katz's claim depends on the absence of probable cause at the time the officers initiated criminal proceedings against him. *See Pitt*, 491 F.3d at 511; *see also Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 559 (4th Cir. 2017).

means taken in prosecuting it are legally just and proper.'" *Id.* at 501-02 (quoting *Ammerman v. Newman*, 384 A.2d 637, 639-40 (D.C. 1978)).

Mr. Katz does not develop an argument that the investigation did not supply the requisite quantum of suspicion to believe that he had committed a crime.[22] The police report states that (1) in an interview, Mr. Goyette described Mr. Katz punching Ms. Ahmad on the right side of her face with a closed fist, (2) Ms. Ahmad sustained swelling on her right cheek, and (3) both Ms. Ahmad and Mr. Goyette identified Mr. Katz in show-ups. Mr. Katz does not dispute that Mr. Goyette and Ms. Ahmad each independently represented to officers that Mr. Katz had assaulted them, and that the taxi driver—seemingly an uninterested third party—corroborated their account. Mr. Katz has not shown that a jury could find it unreasonable for those instituting the proceeding to believe that there was probable cause in these circumstances. *See Ammerman*, 384 A.2d at 640 ("[P]robable cause [in a malicious prosecution case] depends not on the actual state of the case in point of fact, but upon the honest belief of the person instituting [the proceeding]. It may flow from a belief that turns out to be unfounded as long as it is not unreasonable.").[23]

---

[22] His probable cause argument focuses on whether there was probable cause for the *arrest*—which may have occurred pre-investigation—and whether the arrest complied with the District's warrantless misdemeanor arrest statute.

[23] In his complaint, Mr. Katz alleged that "it was clear that Mr. Goyette's and

The absence of any material factual dispute as to the existence of probable cause for the proceeding was sufficient to warrant summary judgment to Officer Cherry and the District on the malicious prosecution claims. Therefore, we need not reach Mr. Katz's arguments about malice. We affirm the trial court's grant of summary judgment to Officer Cherry and the District on the common law malicious prosecution count and to Officer Cherry on the related § 1983 count.

## G. Assault and Battery Claims Against the District

Mr. Katz also challenges the grant of summary judgment to the District on his assault and battery claims.[24] Liability for assault and battery for an officer conducting an arrest or investigative stop turns on "whether the officer's conduct

---

Ms. Ahmad's version of the[se] events . . . [was] not credible," in part because of Mr. Katz's injuries and the fact that officers had seen Mr. Goyette chasing Mr. Katz with a skateboard. Although there were clearly different possible interpretations of the interaction between Mr. Katz and the others, it was not unreasonable—particularly in light of the corroborative statements of the cab driver—to credit Mr. Goyette's and Ms. Ahmad's account to find probable cause to institute proceedings against Mr. Katz. *Cf. Dukore v. District of Columbia*, 799 F.3d 1137, 1143 (D.C. Cir. 2015) (observing that "[t]he essence of probable cause is making close judgment calls based on oftentimes conflicting information" and that "[a]n officer faced with conflicting information . . . may still have probable cause" to effect an arrest (quoting *Galarnyk v. Fraser*, 687 F.3d 1070, 1075 (8th Cir. 2012))).

[24] Mr. Katz does not challenge the grant of summary judgment to Officer Cherry on the assault and battery and excessive force counts. The appellees do not dispute that the District can nonetheless be liable if one of its officers used an unnecessary amount of force.

was reasonably necessary and thereby privileged." *District of Columbia v. Chinn*, 839 A.2d 701, 707 (D.C. 2003) (quoting *Holder v. District of Columbia*, 700 A.2d 738, 742 (D.C. 1997)). In resolving this question, we consider what a reasonable officer on the scene would believe to be necessary, "given the conditions apparent to the officer at the time." *Id.* at 706; *see also Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993). And, in doing so, we "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Etheredge*, 635 A.2d at 916 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

The District contends that its officers used a reasonable amount of force to effect an arrest in handcuffing Mr. Katz.[25] But considering the facts and

---

[25] The District also argues that Mr. Katz's injuries were too minor to sustain his claim. Even assuming that Mr. Katz's injuries were de minimis, the District does not identify a requirement of more than de minimis injury in our case law, and we decline to adopt one. While "[t]he degree of injury is certainly relevant insofar as it tends to show the amount and type of force used, . . . it is logically possible to prove an excessive use of *force* that caused only a minor *injury*." *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011); *accord Wardlaw v. Pickett*, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993); *Hall*, 867 F.3d at 159. Thus, "a rule that forecloses a . . . claim in that circumstance focuses on the wrong question." *Chambers*, 641 F.3d at 906; *see also Rizk v. City of New York*, 462 F. Supp. 3d 203, 223 (E.D.N.Y. 2020) (collecting cases in which courts have "expressly rejected the view that Fourth Amendment excessive force cases can be dismissed because the injury was only de minimis"). The relevant question is whether the officer's use of force was

circumstances of this particular case, a jury could find that the use of force was not reasonably necessary. It might be a different story if Mr. Katz had been handcuffed pursuant to a lawful arrest. But Mr. Katz has put forward facts that would permit a reasonable juror to conclude that MPD officers handcuffed him without probable cause, even though he did not resist officers or attempt to escape, and that they did so not in "standard fashion"[26] but with a level of force that left Mr. Katz in pain for days and prompted him to complain to officers. Moreover, in the light favorable to Mr. Katz, when he did complain, he was "slammed" into a patrol car in a handcuff "adjustment" that provided more discomfort rather than relief. This evidence presents a jury question on the assault and battery claims. *See Kotsch*, 924 A.2d at 1049-50 (reversing grant of summary judgment on assault and battery claims because evidence created a jury question as to whether force used was reasonably necessary in light of appellant's testimony that he did not attempt to flee or resist and because "the jury could consider that the offense [appellant] allegedly committed . . . did not warrant the use of such force as would cause the injuries appellant suffered"); *Hall*, 867 F.3d at 158-60 (reversing grant of summary judgment

---

reasonably necessary in effecting the seizure. *Chinn*, 839 A.2d at 707.

[26] *Cf. Barham v. Ramsey*, 338 F. Supp. 2d 48, 67 (D.D.C. 2004) (noting that the plaintiff-arrestees were "handcuffed in standard fashion" and that there were "no allegations that the manner in which plaintiffs were handcuffed at the time of arrest was unique or abnormally oppressive").

to officer on District law battery claim notwithstanding some evidence suggesting that the suspect may have been "resisting" because a jury could find that the officer "should have perceived that she could resolve the situation without physical force"); *cf. Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 23 (D.D.C. 2011) ("A reasonable juror could find that [the officer] violated [the plaintiff's Fourth Amendment right to be free from excessive force] because the circumstances surrounding [the plaintiff's] arrest were quite benign. In particular, [the plaintiff] was not arrested for any violent crime and . . . did not resist arrest."); *Shannon v. Koehler*, 616 F.3d 855, 863 (8th Cir. 2010) ("Assuming, then, that [the plaintiff's] story is true—*i.e.*, assuming he was not threatening anyone, not resisting arrest, and so on—it was not reasonable for [the officer] to use more than de minimis force against him. It follows, *a fortiori*, that using enough force to cause the injuries that [the plaintiff] alleges . . . was also unreasonable." (citations omitted)).

That the handcuffs were ultimately loosened—albeit after "what felt like a long time"—does not mean that no juror could find the use of force unreasonable. *See Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (finding that plaintiff's allegations that officer "placed handcuffs on him that were excessively tight and failed to respond to [his] repeated requests for them to be loosened," causing "permanent nerve damage," could permit a jury to find the use of force excessive even though the officer did loosen the handcuffs after ten minutes, in part because

the officer was not "in the midst of a dangerous situation" but instead "faced rather benign circumstances that hardly justified his failure to respond more promptly to [the plaintiff's] entreaties, at least to the extent to ascertain if the handcuffs were too tight"); *see also Alexander v. County of Los Angeles*, 64 F.3d 1315, 1323 (9th Cir. 1995) (reversing grant of qualified immunity on excessive force claim where officers initially denied robbery suspect's request to loosen handcuffs, even though the handcuffs were ultimately readjusted).  Because a jury could find on the facts put forth by Mr. Katz that maintaining particularly tight handcuffs for even a relatively short period of time was unreasonable, we reverse the grant of summary judgment to the District on the assault and battery claims.

## III.

We next consider Mr. Katz's challenge to the trial court's resolution of the defendants' motion to dismiss in its April 1, 2016, order.  Mr. Katz contends that the trial court erred when it treated that motion to dismiss as a Rule 56 motion for summary judgment, applying the standards applicable to Rule 56 rather than Rule 12(b)(6).  *See Grayson v. AT&T Corp.*, 15 A.3d 219, 246 (D.C. 2011) (en banc) (comparing these standards).

The appellees conceded at oral argument that the trial court erred in failing to give the parties notice before treating the motion to dismiss as one for summary

judgment. *See* Super. Ct. Civ. R. 56(f) (providing that a trial court may grant summary judgment sua sponte "*[a]fter giving notice and a reasonable time to respond*" (emphasis added)); *see also Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015) ("[W]hen treating a Rule 12(b)(6) motion as a motion for summary judgment, . . . the trial court must give the parties notice of its intention to consider summary judgment and an adequate opportunity to present affidavits or other matters appropriate to ruling on such a motion." (quoting *Washkoviak v. Sallie Mae*, 900 A.2d 168, 178 (D.C. 2006))); *Embassy of Pakistan, IIS v. Lenkin Co. Mgmt.*, 996 A.2d 817, 819 (D.C. 2010) (finding that the trial court's sua sponte conversion of a motion to dismiss into a motion for summary judgment without notice was reversible error). They contend, however, that Mr. Katz forfeited a challenge to the order by failing to raise the error to the trial court.

Mr. Katz's challenge to the order is properly before us. The very nature of the error claimed prevented Mr. Katz from objecting before the entry of summary judgment, especially as he had no reason to anticipate that the trial court would apply summary judgment standards to the defendants' motion. *See Oparaugo v. Watts*, 884 A.2d 63, 76 n.10 (D.C. 2005) (noting that documents referenced in complaint and central to plaintiff's claim can be considered in connection with motion to dismiss without converting the motion into one for summary judgment). Mr. Katz was not required, as the appellees suggest, to file a motion for reconsideration in

order to preserve an objection to the trial court's sua sponte grant of summary judgment.[27]

---

[27] Our cases addressing violations of the notice requirement for sua sponte grants of summary judgment suggest no such requirement. *See, e.g.*, *Embassy of Pakistan, IIS v. Lenkin Co. Mgmt.*, 996 A.2d 817 (D.C. 2010). Although this court has not directly addressed this question, multiple federal courts of appeals have declined to impose such a requirement under similar federal procedural rules. *E.g., D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 210 n.12 (5th Cir. 2018) (noting that where a party directly appeals a grant of summary judgment without moving for reconsideration, a challenge to the procedural propriety of the summary judgment ruling is not forfeited even though raised for the first time on appeal, and distinguishing cases in which a party moved for reconsideration but failed in that motion to raise the procedural challenge); *Francis v. MSC Cruises, S.A.*, 835 F. App'x 512, 518 (11th Cir. 2020) (rejecting the appellee's contention that the appellant had waived any argument that the magistrate judge's sua sponte grant of summary judgment violated Fed. R. Civ. P. 56(f) because "[t]he only way [appellant] could have objected to the *sua sponte* grant would have been to file a motion for reconsideration" and noting that the Eleventh Circuit "ha[s] not required reconsideration motions to preserve objections to *sua sponte* grants of summary judgment"). It is true that in this case the grant of summary judgment was not immediately appealable. C*f. Francis*, 835 F. App'x at 518 (declining to find waiver in part because "[o]nce the magistrate judge granted summary judgment, he immediately entered final judgment and administratively closed the case"). But we see no reason to impose different requirements for claim preservation in cases in which the claimed error occurred in a judgment that immediately became appealable than those in which it did not.

At oral argument, the appellees cited *Rumber v. District of Columbia*, 595 F.3d 1298, 1302 (D.C. Cir. 2010), and *VanHaaren v. State Farm Mutual Automobile Insurance Co.*, 989 F.2d 1, 4-5 (1st Cir. 1993), in support of their argument that Mr. Katz was required to file a motion for reconsideration to preserve this claim. Neither case involves a sua sponte grant of summary judgment, and both are readily distinguishable. In *Rumber*, the issue was whether the litigant had received a "full and fair opportunity to litigate" her constitutional claims in state proceedings, for *Younger* abstention purposes, where the state court had held that she had forfeited

The only remaining question is whether the error was harmless. In reviewing a claim that a trial court erroneously converted a motion to dismiss into a motion for summary judgment without proper notice, we will not reverse unless the appellant was "prejudiced by the manner in which summary judgment was granted." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1038 (D.C. 2014). If the claims on which the court granted summary judgment could have been dismissed under Rule 12(b)(6) (the basis urged in the defendants' motion), the trial court's error in granting summary judgment without notice was harmless.[28] *See Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 312 (D.C. 2006); *cf. Washkoviak*, 900 A.2d at 180 (trial court's error in considering factual allegations extrinsic to the complaint is

---

her constitutional defenses. 595 F.3d at 1301-02 (quoting *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 589 F.3d 433, 436 (D.C. 2009)) (citing *Younger v. Harris*, 401 U.S. 37 (1971)). The D.C. Circuit held that the litigant failed to show that she was deprived of a fair opportunity to raise her defenses in part because she could have challenged the forfeiture ruling in a motion for reconsideration raising new, favorable law but failed to do so. *Id.* at 1302. In *VanHaaren*, the trial court had expressly declined to reach an issue given the plaintiff's failure to raise it; the First Circuit suggested that the plaintiff could have had another bite at the apple had he moved for reconsideration of the trial court's order. *See* 989 F.2d at 4-5. Neither case speaks to whether a motion for reconsideration is required to preserve a challenge to a procedural decision that the trial court made without any prior opportunity for the parties to raise objections.

[28] One consequence of the trial court treating the motion to dismiss as a motion for summary judgment on the incorrect assumption that it was required to do so is that summary judgment precluded Mr. Katz from amending his complaint. Mr. Katz has not identified any pleading deficiencies that could have been resolved by amending the complaint, so we do not address this potential ground of prejudice.

harmless if it is self-evident from the face of the complaint that the plaintiff is not entitled to relief). Thus, we consider each claim that the trial court dismissed in its April 1, 2016, order to determine whether it could have survived a Rule 12(b)(6) motion to dismiss. Whether a complaint states a claim upon which relief can be granted is a legal question we review de novo. *Grayson*, 15 A.3d at 228-29.

## A. Section 1983 Claims Against the District

We first consider whether the conversion to summary judgment was harmless as to Mr. Katz's § 1983 claims against the District. The District cannot be held vicariously liable for its employees' actions under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Municipal liability requires a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). One way to demonstrate a "policy or custom" actionable under § 1983 is a failure-to-train theory: "inadequacy of police training may serve as the basis for § 1983 liability . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388.

The trial court granted summary judgment to the District on Mr. Katz's § 1983 claims because Mr. Katz "failed to present any evidence from which a reasonable juror could find that Defendant District of Columbia had policies or customs that

caused a violation of Plaintiff's constitutional rights." To survive a Rule 12(b)(6) motion to dismiss, however, Mr. Katz was not required to present evidence. He needed only include in his complaint "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 709 (D.C. 2013) (quoting *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011)).

In relevant part, Mr. Katz's amended complaint alleges that the officers' actions underlying the constitutional claims "were a direct and proximate result of Defendant District of Columbia's failure to properly hire, train, and/or supervise them." The complaint also alleges that the District "fail[ed] to properly train and/or supervise . . . officers employed by MPD with respect to the proper investigation procedures and on procedures for arresting individuals they come into contact with." Because these allegations are no more than bare legal conclusions, however, they are insufficient to state a § 1983 claim against the District on a failure-to-train theory. *See Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 99 (D.C. 2018) (explaining that the principle that a court should "assume the[] veracity" of "well-pleaded factual allegations" does not extend to "[b]are allegations of wrongdoing" or "legal conclusion[s] couched as . . . factual allegation[s]"); *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 138 (D.C. 2021) ("[T]he 'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting *OneWest Bank, FSB*

*v. Marshall*, 18 A.3d 715, 721 (D.C. 2011))); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (rejecting the idea that proof of a single instance of unconstitutional activity can support *Monell* liability by raising an inference that the unconstitutional act resulted from inadequate training).

Because Mr. Katz failed to state a claim for municipal liability under § 1983, the conversion to summary judgment was harmless as to the § 1983 counts against the District. We affirm the dismissal of the § 1983 malicious prosecution claim against the District,[29] the § 1983 unlawful arrest claim against the District, and the excessive force claim against the District.[30]

## B. Negligent Hiring, Training, Retention and Supervision

The trial court also granted summary judgment to the District on Mr. Katz's

---

[29] Moreover, the grant of summary judgment to the District on the § 1983 malicious prosecution claim was necessarily harmless given that Mr. Katz could not make out a malicious prosecution claim against any individual officer. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (establishing that if a plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations).

[30] Although Mr. Katz's complaint does not refer to § 1983 in the "excessive force" count, we agree with the trial court's construction of this count as a § 1983 claim. *See, e.g.*, *District of Columbia v. Jackson*, 810 A.2d 388, 393 (D.C. 2002). To the extent it states a common law claim—which, unlike a § 1983 claim, would permit recovery on a theory of respondeat superior, *see Wade*, 310 A.2d at 860, 863—this is duplicative of the battery claim against the District and so the dismissal was harmless. *See Chinn*, 839 A.2d at 706.

common law claim of negligent hiring, training, retention, and supervision. To invoke negligent hiring or supervision as a theory of liability, a party must "show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (emphasis omitted).

Mr. Katz's complaint alleges that the District hired and retained Officer Cherry, Officer Butler, and Sergeant Maguire "despite actual and/or constructive knowledge of incompetence" and that the District "fail[ed] to properly train and/or supervise" the officers "with respect to the proper investigation procedures and . . . procedures for arresting individuals." These allegations are not "enough to raise a right to relief above the speculative level." *Close It! Title Servs., Inc.*, 248 A.3d at 138 (quoting *OneWest Bank*, 18 A.3d at 721); *see also Grayson v. AT&T Corp.*, 140 A.3d 1155, 1161-62 (D.C. 2011) ("'[W]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' . . . '[W]e are not bound to accept as true a legal conclusion couched as a factual allegation.'" (second alteration in original) (first quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and then quoting *Papasan v. Allain*, 478 U.S.

265, 286 (1986))). Because this claim could have properly been dismissed pursuant to Rule 12(b)(6), the grant of summary judgment on this claim did not prejudice Mr. Katz.

## C. Negligence

The trial court also granted summary judgment for the District and the officers on Mr. Katz's negligence claim. The complaint asserts that the officers "owe a duty of reasonable care" and "[p]lead[s] in the alternative" that MPD officers acted negligently, "includ[ing], but . . . not limited to, the negligent arrest of [Mr. Katz], the negligent taking of him into custody, the negligent application of handcuffs and other negligent acts."

The claims of "negligent arrest" and "negligently taking [Mr. Katz] into custody" are indistinguishable from Mr. Katz's false arrest claims. *See Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006) (holding that plaintiff's negligence claim "based on the actions of the arresting officers" was properly dismissed because it was "not separate and distinct from [her] false arrest claim"). The negligence claim based on the application of the handcuffs also fails to state "a separate and distinct claim for negligence apart from the battery allegations." *Chinn*,

839 A.2d at 711.[31]

Because Mr. Katz did not allege "independent grounds for finding negligence," the negligence claim could not have been sent to the jury alongside the intentional tort claims, *id.* at 712, and so the trial court's grant of summary judgment on the negligence count was harmless.

### D. Remaining Claims Against Officer Butler and Sergeant Maguire

Counsel for Mr. Katz stated at oral argument that Mr. Katz would not pursue his claims against Officer Butler if the case were remanded.[32] Accordingly, the trial

---

[31] In his opposition to the motion to dismiss, Mr. Katz relied on *Dormu v. District of Columbia*, in which the federal district court found that the plaintiff's contention that "there is a standard of care that requires police officers to ensure that the handcuffs 'be double locked to prevent further closing of the cuff . . . '" was sufficient to establish a standard of care that was distinct from the duty not to use excessive force. 795 F. Supp. 2d at 30; *see Chinn*, 839 A.2d at 711 ("[If] a negligence count is to be submitted to a jury, that negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care."). Mr. Katz presented an expert opinion stating that "fail[ing] to check the tightness of [the] handcuffs . . . constitute[d] an unreasonable use of force that is a violation of national and local police standards." We do not find this a standard of care distinct from the duty to use reasonable force. Given that Mr. Katz's negligence claim concerns the amount of force used in the intentional application of handcuffs, he has not alleged "independent grounds for finding negligence." *Chinn*, 839 A.2d at 712.

[32] Officer Butler is listed on the arrest report under "Officers on Scene" as "Crime Scene Search Ofc. Butler." The information produced during discovery indicated that she took photos of Mr. Katz at the scene. There is no indication that

court's dismissal of the claims against Officer Butler did not prejudice Mr. Katz. As to Sergeant Maguire, the dismissal of the malicious prosecution claim against him was harmless—even assuming that he could be a proper defendant for this claim— given that there was probable cause to initiate a proceeding against Mr. Katz. See *supra* Section II.F. But we must determine whether the dismissal of Mr. Katz's false arrest, assault and battery, and § 1983 unlawful arrest and excessive force claims against Sergeant Maguire was harmless.

The trial court dismissed Sergeant Maguire from the case on qualified immunity grounds given that Mr. Katz "made no showing that [Sergeant Maguire was] involved in the arrest and handcuffing of [Mr. Katz]." But the only showing Mr. Katz had to make at the motion-to-dismiss stage was to plead facts supporting a plausible inference of entitlement to relief. His amended complaint alleges that shortly after Mr. Katz ran up to the police officers, "an officer on the scene slammed [Mr. Katz] into the back of a police car and handcuffed him." It also states that "[t]he Arrest/Prosecution Report . . . identifies [Sergeant] Maguire as" one of three "officers on the scene." These allegations made it plausible that Sergeant Maguire was liable for the arrest and handcuffing of Mr. Katz. *See Potomac Dev. Corp.*, 28 A.3d at 544 ("To survive a motion to dismiss, a complaint must contain sufficient

---

she was otherwise involved in the arrest or handcuffing of Mr. Katz.

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))); *cf. Gudger v. District of Columbia*, 74 F. Supp. 3d 47, 52 (D.D.C. 2014) (concluding that accepting plaintiff's request to infer that certain named defendants were the "unknown officers" present for search and arrest would "*contradict* the factual allegation[s] pled in the Complaint" (emphasis added)).

The appellees argue that even if Mr. Katz's complaint stated claims against Sergeant Maguire, however, the dismissal of those claims was nonetheless harmless because subsequent discovery made clear that they would fail as a matter of law. This is so, they argue, because there are no material disputes of fact as to threshold issues such as the existence of probable cause for Mr. Katz's arrest or the excessiveness of the force used in arresting him. But as addressed above in connection with the claims against Officer Cherry and the District, we disagree.

As to the common law and § 1983 arrest claims, we cannot say as a matter of law that there was legal justification for Mr. Katz's detention or that the officers involved were entitled to qualified immunity. See *supra* Sections II.D–E. And, as a factual matter, none of the evidence that was adduced after Sergeant Maguire's dismissal established that Sergeant Maguire was not present at the scene or otherwise eliminated the possibility that he could be liable on these claims. Accordingly, the

appellees have not shown that the dismissal—which may have precluded further discovery about Sergeant Maguire's involvement in Mr. Katz's arrest—was harmless.

Similarly, we do not agree with the appellees that no reasonable jury could find that an unreasonable amount of force was used against Mr. Katz. See *supra* Section II.G. And here, too, the factual record as it stands now—which includes Sergeant Maguire's testimony that he heard Mr. Katz's complaints about the tightness of the handcuffs and checked the handcuffs—does not foreclose the possibility that Sergeant Maguire could be liable to Mr. Katz for assault and battery. Thus, for the reasons stated above with respect to the assault and battery claims against the District, we find that the dismissal of the assault and battery claims against Sergeant Maguire was not harmless.

As to the § 1983 excessive force claim, Mr. Katz must also overcome Sergeant Maguire's invocation of qualified immunity. *See Etheredge*, 635 A.2d at 916 n.10 (acknowledging that "there are differences between a federal constitutional claim [for excessive force] and a tort suit brought under District of Columbia law"); *Kotsch*, 924 A.2d at 1047 n.7 (noting the "theoretically different . . . underpinnings between the defense of qualified privilege against common law tort claims and qualified immunity from constitutional claims"). The amended complaint is

sufficient to pass this hurdle, as it plausibly describes a use of force without justification. *See Hall*, 867 F.3d at 157 (reversing trial court's dismissal of § 1983 excessive force claim, notwithstanding officer's invocation of qualified immunity, where the plaintiff's complaint described a use of force "without justification" because it alleged that the officer had thrown plaintiff against a wall, dragged her out of a bar, and tightened her handcuffs so as to cause a wrist injury and it "contain[ed] no indication that [the plaintiff] posed any threat to [the officer] or others, or that [she] had committed a serious crime").

The evidence that has been produced in the course of discovery does not lead us to conclude that the dismissal was nonetheless harmless because the excessive force claim would be dismissed on qualified immunity grounds at the summary judgment stage. Our case law predating this incident made clear that even where officers are effecting an arrest for which they have probable cause—a circumstance that is far from certain here—a use of force is unreasonable if not necessary to "protect [the officers] or to control [the detainee's] aggression." *See Kotsch*, 924 A.2d at 1049-50. We also agree with Mr. Katz that the federal district court's decision in *Dormu v. District of Columbia* served to put MPD officers on clear notice that "overly tight handcuffing can constitute excessive force, where the handcuffing has resulted in injury or where an individual complains about the overly-tight cuffing." 795 F. Supp. 2d at 23-24 (citing pre-2011 decisions from "[a]lmost every

Court of Appeals" supporting this point). While *Dormu* itself may not be sufficient to "clearly establish" that overly tight handcuffing in benign circumstances is a constitutional violation, *Dormu* found—based on an "overwhelming" consensus among other courts—that this law was already clearly established in 2011, years before the handcuffing here, such that an officer working in the District of Columbia would have known that such an action violated the Fourth Amendment. *Id.*[33] We find this sufficient to conclude that the notice-less grant of summary judgment on the excessive force claim was not harmless.

Because we are not convinced that the trial court's dismissal of the common law and § 1983 unlawful arrest and excessive force claims against Sergeant

---

[33] In *Dormu*, the court distinguished cases in which there was no or de minimis injury in finding it clearly established that the plaintiff "had the right to be free from injury-inflicting handcuffing where [he] complained about the tightness of the cuffs." 795 F. Supp. 2d at 24. Here, it is undisputed that Mr. Katz suffered some physical injury from the handcuffs. *Dormu* also distinguished cases in which "the plaintiff never requested that the handcuffs be adjusted." *Id.* Here, of course, Mr. Katz did make such a request, and there are factual disputes as to the response he received. Sergeant Maguire testified that he checked the handcuffs and determined that they were properly applied. But Mr. Katz describes being slammed against a police car and kept in excessively tight handcuffs for a "fair amount of time." Particularly in light of these factual disputes, we do not think that the fact that this case may be factually distinguishable from *Dormu*—either because Mr. Katz's injury may be less severe or because officers did not completely ignore Mr. Katz's complaints of too-tight handcuffs—means that it is necessarily the case that the dismissal of the § 1983 excessive force claim against Sergeant Maguire was harmless.

Maguire—erroneously using the heightened summary judgment standard without notice to the parties—did not prejudice Mr. Katz, we reverse these aspects of the trial court's April 1, 2016, order. This does not mean, of course, that Sergeant Maguire cannot argue on remand that he is entitled to summary judgment. We only decide at this stage that nothing in the appellees' argument or the record presently before us suffices to show that Sergeant Maguire's dismissal was harmless.

## IV.

Material factual disputes precluded entry of summary judgment on Mr. Katz's false arrest claims against Officer Cherry and the District, his § 1983 unlawful arrest claim against Officer Cherry, and the assault and battery claims against the District. We thus reverse the January 24, 2018, grant of summary judgment on those claims. We also reverse the April 1, 2016, grant of summary judgment on the common law and § 1983 unlawful arrest claims against Sergeant Maguire and the assault and battery and excessive force claims against Sergeant Maguire, given that these claims were dismissed without giving Mr. Katz any opportunity to present evidence. We remand the case for further proceedings with respect to these claims. In all other respects, we affirm.

*So ordered.*